MORGAN REED CATES, BY HIS GUARDIAN AD LITEM, WACHOVIA BANK & TRUST COMPANY, N.A.; AND JOYCE REED CATES, INDIVIDUALLY v. STANLEY C. WILSON; JEFFREY A. TODD; AND STANLEY C. WILSON AND JEFFREY A. TODD, A PARTNERSHIP

No. 24PA87

(Filed 5 November 1987)

**1. Damages § 10— collateral source rule—evidence of past Medicaid payments**

The collateral source rule prohibits the defendants in a medical malpractice case from offering evidence that past Medicaid payments have mitigated plaintiffs' damages since Medicaid provides for a right of subrogation in the State to recover sums paid to plaintiffs, and evidence of a collateral source is improper when plaintiff will not receive a double recovery. N.C.G.S. § 108A-57.

**2. Damages § 10— collateral source rule—future public benefits**

The collateral source rule bars the defendants in a medical malpractice action from offering evidence demonstrating that plaintiffs can mitigate their damages by using future public benefits since (1) forcing plaintiffs to depend on public coffers stands at odds with the compensatory goal underlying our tort system; (2) the lack of certainty characterizing the availability of public resources renders it unwise to allow mitigation of damages premised on their continued existence; (3) utilization of many public benefits hinges on a plaintiff's continued indigency, and a plaintiff could face the possibility of having damage awards reduced based on the presumed availability of benefits when in fact the award itself, albeit reduced, rendered plaintiff ineligible for benefits; and (4) as between defendants who tortiously inflict injury and innocent taxpayers who fund public programs, the loss should fall on the tortfeasor.

**3. Damages § 10— collateral source rule—gratuitous familial aid**

The collateral source rule prohibits the defendants in a medical malpractice action from offering evidence that gratuitous services and payments by

1

the minor plaintiff's grandmother will mitigate plaintiffs' damages since forced dependence on those services is antithetical to the goal of damage awards in our tort system, and the continued availability of gratuitous familial aid is uncertain.

**4. Damages § 10— collateral source evidence—prejudicial error**

In a medical malpractice action by a mother and a child born with cerebral palsy and mental retardation, the trial court's erroneous admission of collateral source evidence of past and future Medicaid benefits, AFDC payments and child support constituted prejudicial error entitling plaintiffs to a new trial on issues of liability and damages, although the jury at the original trial found no liability by defendants and thus did not reach the damages issue, since defense counsel argued strenuously that whatever injuries plaintiffs suffered had been and would be compensated in full by public services, and it cannot be said that the jury's consideration of the liability issue was unaffected by the collateral source evidence.

**5. Evidence § 14; Physicians, Surgeons and Allied Professions § 15.2— waiver of physician-patient privilege—information and opinions**

Plaintiffs waived their physician-patient privileges as to non-party treating physicians whom defendants called as expert witnesses when plaintiff mother testified on direct examination concerning her communications with these physicians and plaintiffs failed to object to testimony by these physicians giving detailed descriptions of the nature of plaintiffs' injuries. Furthermore, this waiver extended not only to information obtained by the treating physicians but also to opinions held by the treating physicians formed as a result of information gained during their treatment of plaintiffs.

Justice MITCHELL concurring in result.

Justice MEYER joins in the concurring opinion.

ON discretionary review of a decision of the Court of Appeals, 83 N.C. App. 448, 350 S.E. 2d 898 (1986), vacating the judgment entered by *Walker, J.,* and the verdict, at the 14 August 1985 Civil Session of Superior Court, GUILFORD County, and ordering a new trial. This Court granted limited discretionary review on 8 April 1987. Heard in the Supreme Court 10 September 1987.

*Clark & Wharton by David M. Clark and John R. Erwin; Colson, Hicks & Eidson by Mike Eidson for plaintiff appellees.*

*Henson, Henson, Bayliss & Coates by Perry C. Henson and Jack B. Bayliss, Jr., for defendant appellants.*

*Petree, Stockton & Robinson by J. Robert Elster, amicus curiae.*

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan by James D. Blount, Jr., and William H. Moss, for North Carolina Medical Society, amicus curiae.*

*Patterson, Dilthey, Clay, Cranfill, Sumner & Hartzog by Robert M. Clay, Susan K. Burkhart and Theodore B. Smyth, for North Carolina Association of Defense Attorneys, amicus curiae.*

*Harris, Bumgardner & Carpenter by Nancy C. Northcott and Don H. Bumgardner, for North Carolina Academy of Trial Lawyers, amicus curiae.*

EXUM, Chief Justice.

This is a medical malpractice action. The questions presented are whether evidence was admitted at trial in violation of (1) the collateral source rule and (2) the physician-patient privilege. The Court of Appeals concluded evidence was improperly admitted on both counts and ordered a new trial. We disagree with the Court of Appeals' conclusion that the physician-patient privilege was violated; but we agree that evidence was admitted in violation of the collateral source rule. Thus, we modify and affirm the Court of Appeals' decision.

Plaintiff Joyce Cates was a regular patient of defendant Dr. Stanley Wilson. She testified that in January of 1978 she sought his help in reducing her weight. At the time, Ms. Cates weighed 241 pounds and stood 5'8" tall. Ms. Cates also testified she saw Dr. Wilson on several subsequent occasions in 1978. In June and July Dr. Wilson treated Ms. Cates for yeast infections. In August Dr. Wilson referred her to a neurologist and neurosurgeon to correct numbness in her hands caused by carpal tunnel syndrome. Also in August Ms. Cates complained of jumping sensations in her abdomen. In November, Dr. Wilson treated Ms. Cates for urinary problems.

Ms. Cates testified that on 25 February 1979 she experienced periodic intervals of sharp back pain. Her mother, Julia Cates, made an appointment for her to see Dr. Wilson on 27 February 1979. Ms. Cates declared that on the morning of 27 February she experienced a green discharge pouring from her vagina. She proceeded to see Dr. Wilson who, for the first time, administered a pregnancy test. Ms. Cates tested positive. Dr. Wilson then

ordered a sonogram which revealed that the baby was ready to be born. Dr. Wilson referred Ms. Cates to Dr. Charles Lomax, an obstetrician. Dr. Lomax and his partner, Dr. Robert Wein, admitted Ms. Cates to the hospital. She gave birth, by cesarean section, to plaintiff Morgan Cates in the early evening of 27 February 1979. Morgan Cates was born mentally retarded and with cerebral palsy.

At trial the court granted defendants' motion for a directed verdict against Joyce Cates at the close of all the evidence. The jury found that Morgan Cates suffered no injury as a result of any negligence on the part of Dr. Wilson. Judgments for defendants were entered on this verdict against each plaintiff.

## I.

The first question presented is whether introduction by defendants of evidence that gratuitous public benefits served, and will serve, to mitigate plaintiffs' damages violates the collateral source rule. We hold it does, whether the evidence is brought out in defendants' case in chief or on cross-examination of plaintiffs' witnesses.

At the outset of the instant case plaintiffs brought a motion in limine to prohibit reference to the fact that Medicaid paid a portion of plaintiffs' medical expenses. The court denied the motion and at trial allowed defendants to show first, that Medicaid had paid all of Morgan's medical bills at the time of trial, and second, that Medicaid would continue to pay for many of them in the future. Defendants also elicited evidence regarding other welfare programs which helped defray some of the expenses caused by Morgan's medical condition. On cross-examination of Julia Cates, Morgan's grandmother, defendants demonstrated, over objection, that Morgan's father pays $30.00 a week in child support, and that Joyce Cates receives monthly welfare checks under the "Aid For Dependent Children" program (AFDC). Cross-examination also revealed, this time without objection, that Julia allows Joyce and Morgan to live with her free of charge, helps them meet expenses, and provides an automobile for transporting Morgan to school.

Plaintiffs called Dr. Paul Deutsch, an expert in evaluating the needs of handicapped persons, who testified concerning the costs

of Morgan's current and future needs. On direct examination Dr. Deutsch testified that a local public school, Gateway Education Center, provided excellent training for mentally and physically handicapped persons until age 22. He described its funding through Public Law 94-142, declaring that although this has been a reliable public resource, no one can guarantee its continued availability.

On cross-examination defendants questioned Dr. Deutsch concerning the availability of Intermediate Care Facilities (ICFs) to meet Morgan's future residential needs. Dr. Deutsch testified that these facilities, administered by the state and funded by Medicaid, functioned as residences for mentally retarded indigents. He declared that while ICFs might meet Morgan's basic needs, Morgan's overall best interest would be better served by home care rather than institutional care. He went on to note that while both public programs provide for the care of the mentally handicapped, eligibility for ICFs hinges on indigency. Special education funded under Public Law 94-142 is available to all, regardless of financial status.

Dale Metz, the director and principal of Gateway Education Center, testified for defendants concerning the treatment offered Morgan at Gateway. Metz also testified concerning the availability of ICFs in the Greensboro area. He described a proposed residential facility sponsored by the Greensboro Cerebral Palsy Association for which Morgan might qualify. Metz characterized the proposed facility as "very much in the tentative stages."

The Court of Appeals held that admission of the above described evidence violated the collateral source rule. It went on to find the error prejudicial. We affirm these aspects of the decision below.

In *Young v. R.R.*, 266 N.C. 458, 466, 146 S.E. 2d 441, 446 (1966), this Court explained the collateral source rule. According to this rule a plaintiff's recovery may not be reduced because a source collateral to the defendant, such as "a beneficial society," the plaintiff's family or employer, or an insurance company, paid the plaintiff's expenses. *Id.* Rather, an injured plaintiff is entitled to recovery " '. . . for reasonable medical, hospital, or nursing services rendered him, whether these are rendered him gratuitously or paid for by his employer.' " *Id.* (quoting *Roth v. Chatlos*, 97 Conn. 282, 288, 116 A. 332, 334 (1922) ).

The instant case presents the issue of whether the collateral source rule embraces gratuitous government benefits. We hold it does, believing that this follows logically from our holding in *Young*. To facilitate application of this rule to the present case, we analyze separately the collateral source rule with respect to past Medicaid payments, future public benefits, and gratuitous care provided in the home.

[1]   With regard to Medicaid payments already received we find our *Young* decision persuasive. In *Young* we held that receipt of insurance proceeds should not reduce a plaintiff's recovery. 266 N.C. at 466, 146 S.E. 2d at 446. Medicaid is a form of insurance paid for by taxes collected from society in general. "The Medicaid program is social legislation; it is the equivalent of health insurance for the needy; and, just as any other insurance form, it is an acceptable collateral source." *Bennett v. Haley*, 132 Ga. App. 512, 524, 208 S.E. 2d 302, 311 (1974).

Application of the collateral source rule to Medicaid payments also finds justification in the absence of any "windfall profit" for the plaintiff. North Carolina law entitles the state to full reimbursement for any Medicaid payments made on a plaintiff's behalf in the event the plaintiff recovers an award for damages. N.C.G.S. § 108A-57 provides in pertinent part:

> (a) Notwithstanding any other provisions of the law, to the extent of payments under this Part, the State, or the county providing medical assistance benefits, shall be subrogated to all rights of recovery, contractual or otherwise, of the beneficiary of such assistance, or of his personal representative, his heirs, or the administrator or executor of his estate, against any person. . . .

> (b) It shall be a misdemeanor for any person seeking or having obtained assistance under this Part for himself or another to willfully fail to disclose to the county department of social services or its attorney the identity of any person or organization against whom the recipient of assistance has a right of recovery, contractual or otherwise.

(Cum. Supp. 1985). Our decisions establish the principle that evidence of a collateral benefit is improper when the plaintiff will not receive a double recovery. *See Spivey v. Wilcox Co.*, 264 N.C.

387, 390, 141 S.E. 2d 808, 811-12 (1965). Because Medicaid provides for a right of subrogation in the state to recover sums paid to plaintiffs, we find that the principle enunciated in *Spivey* applies in the instant case as well.

[2]   Concerning future public benefits we hold that the collateral source rule bars defendants from offering evidence demonstrating that plaintiffs can mitigate their damages by using public resources. We base our holding on three grounds.

First, forcing plaintiffs to depend on public coffers, a situation foreseeable under a contrary rule, stands at odds with the compensatory goal underlying our tort system. The goal of the law of damages is to place an injured party in as nearly the same position as he would have been had he not been injured. *Phillips v. Chesson*, 231 N.C. 566, 58 S.E. 2d 343 (1950). Forced dependence on public charity because of injuries tortiously inflicted puts the injured party in a position more disadvantageous than if he were freed from this dependence. Full compensation that frees the injured party from dependence on charity is more in keeping with the compensatory goal of tort recovery. As one commentator has noted:

> The plaintiff should be able to recover the cost of future medical services, since he is likely to prefer private care, and it is his "right" to have it. It may be that he will employ the free care for which he is eligible and thereby receive a "windfall," but . . . at the time of suit there is no way of knowing what he will choose to do.

Sedler, *The Collateral Source Rule and Personal Injury Damages: The Irrelevant Principle and the Functional Approach (Part II)*, 58 Ky. L.J. 161, 186 (1970).

The second reason for applying the collateral source rule to future public benefits is that the lack of certainty characterizing the availability of public resources renders it unwise to allow mitigation of damages premised on their continued existence. All public programs exist subject to legislative approval. While some programs maintain more stability than others, injured plaintiffs cannot count on their continued availability. In the present case, for instance, none of the future public benefits introduced by the defendants—ICFs funded by Medicaid, special education funded

by the federal government, and Aid for Families with Dependent Children—will necessarily continue for Morgan's lifetime. The state and federal governments may restrict or withdraw Medicaid benefits. *See, e.g.,* 42 U.S.C.A. § 1396 *et seq.* (Cum. Supp. 1986) (providing that state plans not complying with federal law will receive no federal funding); *see also Harris v. McRae,* 448 U.S. 297, 308, 65 L.Ed. 2d 784, 799-800 (1980) (upholding state refusal to fund nonessential abortions with Medicaid funding after Congress withdrew financial support). Similarly, the federal government may abandon special education and welfare programs for any number of reasons, not the least of which is the need to balance an ever more unbalanced federal budget. To encourage juries to mitigate damages based on tenuous public resources forces plaintiffs, like the foolish house builder in the parable, to rebuild lives on shifting sands. The floods may come, and the winds blow, and great will be the fall.

The third reason that the collateral source rule should apply to future public benefits is that utilization of many of these benefits hinges on a plaintiff's continued indigency. In the event of a meaningful recovery, however, a plaintiff may no longer qualify. Thus, a plaintiff could face the possibility of having damage awards reduced based on the presumed availability of benefits, when in fact the award itself, albeit reduced, renders plaintiff ineligible for benefits. The instant case exemplifies such a possible scenario. Defendants stressed continually, on direct and cross-examination, that under the Medicaid program Morgan's future residential needs could be met by ICFs. Similarly, defendants brought out on cross-examination that monthly AFDC and parental support checks defray the cost of Morgan's care. Based on such evidence, without a full explanation of state and federal requirements for participation, the jury might reasonably have concluded that plaintiffs would have received a double recovery unless their damages were reduced by an amount corresponding to the welfare's value. In fact, even a modest recovery by plaintiffs might have made them ineligible to benefit from these resources. *See Medicaid Eligibility Manual* § 2375, published by the State of North Carolina Department of Human Resources, Division of Medical Assistance, Income Maintenance Section (1987).

Finally, as between defendants who tortiously inflict injury and innocent taxpayers who fund programs such as Medicaid, we think it better that the loss fall on the tort-feasor.

[3] With regard to the application of the collateral source rule to future care provided in Morgan's home, we find our decision in *Young* controlling. In *Young* we held that evidence of gratuitous services and payments by a family member should not serve to mitigate a plaintiff's damages. 266 N.C. at 466, 146 S.E. 2d at 446. Family members perform gratuitous services for their injured relative's benefit, not the tort-feasor's. As with other future benefits, forced dependence on these services, rather than the independence associated with a plaintiff made whole, is antithetical to the goal of damage awards in our tort system. Furthermore, like government sponsored welfare programs, uncertainty characterizes the continued availability of gratuitous familial aid. For these reasons we decline to depart from our holding in *Young.*

[4] Defendants argue that even if, as a general matter, it violates the collateral source rule to introduce evidence of publicly provided special education, admission of this evidence in the instant case was not erroneous because plaintiffs "opened the door" by bringing the matter up first. Defendants make a similar argument with regard to home care provided by Julia Cates. These arguments may have merit, but we decline to address them in this case. Plaintiffs did not "open the door" with regard to past and future Medicaid benefits. Plaintiffs also preserved for appeal their objections to admission of evidence concerning AFDC and child support. We find that the erroneous admission of evidence regarding Medicaid, AFDC, and child support in itself requires a new trial. We therefore uphold the decision of the Court of Appeals without analyzing whether plaintiffs can prevail on appeal because of other violations of the collateral source rule.

Our prior cases, as well as those from other jurisdictions, demonstrate that the erroneous admission of collateral source evidence often must result in a new trial. *See, e.g., Eichel v. New York Central R.R. Co.,* 375 U.S. 253, 11 L.Ed. 2d 307 (1963); *Spivey v. Wilcox Co.,* 264 N.C. 387, 141 S.E. 2d 808; *Fincher v. Rhyne,* 266 N.C. 64, 145 S.E. 2d 316 (1965). The likelihood of prejudice is great because the evidence tends to suggest to the jury that the outcome of the trial is immaterial to the party benefiting

from the collateral source. *Fincher,* 266 N.C. at 68, 145 S.E. 2d at 319. This has long been recognized with regard to liability insurance. According to this Court's decision in *Fincher,* no circumstance "is more surely calculated to cause a jury to render a verdict against the defendant, without regard to the sufficiency (weight) of the evidence, than proof that the person against whom such verdict is sought is amply protected by indemnity insurance." *Id.* at 69, 145 S.E. 2d at 319. Similarly, the United States Supreme Court acknowledged that evidence of the "receipt of collateral social insurance benefits involves a substantial likelihood of prejudicial impact." *Eichel,* 375 U.S. at 255, 11 L.Ed. 2d at 309. The prejudice stems from the probability that juries will consider the availability of collateral sources as indicative of the lack of any real damages. *See generally* Sedler, *The Collateral Source Rule and Personal Injury Damages: The Irrelevant Principle and the Functional Approach (Part I),* 58 Ky. L.J. 36, 47-56 (1970).

In spite of this Court's traditional reticence to find the erroneous admission of collateral source evidence nonprejudicial, defendants argue that evidence related solely to damages could not have prejudiced plaintiffs on the issue of liability. Defendants contend the jury never reached the damages issue because it decided not to find defendants liable for Morgan's condition. Defendants maintain it is unduly speculative to presume that the inadmissible evidence influenced the jury on their decision regarding liability. We disagree.

A review of the closing arguments to the jury reveals that defendants capitalized on the evidence of collateral sources to argue that plaintiffs suffered no damages. Defense counsel asserted there is "not one penny of loss that you all have heard that Morgan Cates or his mother has paid for this child that they wouldn't have paid for a normal child. Not one penny." He went on to declare that plaintiffs failed to prove "that this child would suffer a penny with its Medicaid, its Aid to Dependent Children, its own father looking after it and supporting it." He also stated that "until [Morgan]'s 22 he'll get the free care right there, the daily care at one of the best facilities in the country. And after that these ICFs are very well provided for and the care is excellent there." Defense counsel thus argued strenuously that whatever injuries the plaintiffs suffered, they had been, and would be, compensated in full by public sources.

In light of this kind of argument and the nature of the collateral source evidence which was so freely admitted, we find unpersuasive defendants' contention that the jury's consideration of the liability issues was unaffected by this evidence. We agree with the conclusion of Judge Wells, writing for a unanimous Court of Appeals, that defendants' emphasis throughout the trial on the "numerous gratuitous avenues of compensation [that] existed for plaintiffs' benefit substantially eroded plaintiffs' verdict-worthiness by suggesting to the jury that plaintiffs were already fully compensated and were trying to obtain a double recovery." 83 N.C. App. at 455, 350 S.E. 2d at 903.

II.

[5] The second question presented is whether a plaintiff who has waived his physician-patient privilege as to nonparty treating physicians may preclude these physicians from testifying as experts for the defendant. We hold he may not. Once a plaintiff waives his right to prohibit disclosures of confidences by his physicians he may not assert the physician-patient privilege to prevent them from testifying as experts for his opponent.

Plaintiffs called one of the defendants, Dr. Stanley Wilson, as their first witness. Questioning Wilson as an adverse witness, plaintiffs elicited detailed testimony regarding each occasion on which he communicated with Joyce Cates, from their initial meeting on 9 February 1978, through every subsequent contact until 27 February 1979. They asked him to explain each diagnosis he made, and every treatment he prescribed. Plaintiffs introduced Dr. Wilson's medical records into evidence. Plaintiffs also introduced into evidence all of Joyce Cates' and Morgan Cates' medical records.

Joyce Cates testified concerning the occasions on which she consulted Dr. Wilson, as well as her other treating physicians. Once again, the testimony covered each office visit and telephone call in meticulous detail. Ms. Cates described her changing physical condition, and Dr. Wilson's corresponding diagnoses. Ms. Cates also testified concerning her consultation with Dr. Martin A. Hatcher, the neurologist who treated her for carpal tunnel syndrome. She recounted his examination and diagnosis. She then

described the surgery that Dr. Hatcher and Dr. Stephen C. Robinson, a neurosurgeon, performed to alleviate the carpal tunnel syndrome. Finally, Ms. Cates testified concerning her initial visit with Drs. Robert Wein and Charles Lomax, the obstetricians to whom Dr. Wilson referred Ms. Cates upon diagnosing her as pregnant. She related the details of Dr. Wein's examination, as well as his and Dr. Lomax's decision to admit her to the hospital.

Plaintiffs called three expert witnesses, each of whom testified in detail using the medical records prepared by plaintiffs' treating physicians. Dr. Samuel H. Shelbourne, a pediatric neurologist, reviewed Morgan Cates' condition immediately prior and subsequent to delivery. He posited that Morgan's brain damage might have been averted had he been delivered earlier on 27 February. Dr. Shelbourne based his opinion, in large measure, upon a review of medical records from Moses Cone Hospital. Some of these records were prepared by Dr. Samuel Ravenel, a pediatrician who examined Morgan Cates in the intensive care nursery at Moses Cone. Dr. Harlan Giles, an obstetrician-gynecologist, analyzed the records prepared by Dr. Wein and concurred with Dr. Shelbourne. Dr. Julian Keith, a family practitioner, reviewed medical records prepared by Dr. Wilson, as well as those from Moses Cone Hospital, and concluded that Dr. Wilson fell below the standard of care for family practice physicians by not ordering a pregnancy test prior to 27 February 1987.

Defendants responded to plaintiffs' expert testimony by calling ten expert witnesses, five of whom treated Joyce or Morgan Cates during the course of events pertinent to the pending suit. Drs. Wein and Lomax testified as experts in the field of obstetrics and gynecology, declaring that the events of 27 February made no difference in Morgan Cates' condition. Drs. Robinson and Hatcher opined that Dr. Wilson's performance did not fall below the accepted standard of care when he failed to order a pregnancy test upon finding that Joyce Cates had carpal tunnel syndrome. Dr. Ravenel testified that in his opinion the outcome would not have differed had Joyce given birth earlier on 27 February.

Plaintiffs did not object to the testimony of any of the five treating physicians insofar as it concerned a recitation of the facts surrounding Joyce's and Morgan's physical conditions. Similarly,

plaintiffs registered no objection when these physicians described the course of treatment conducted on the plaintiffs' behalf. When, however, defendants asked these physicians for their expert opinions, plaintiffs objected, claiming that such expert testimony violated the physician-patient privilege.

Plaintiffs pressed their objection on appeal. The Court of Appeals found that the plaintiffs had waived the physician-patient privilege "regarding *'information'* obtained by their treating physicians in the course of treatment and diagnosis." *Cates,* 83 N.C. App. at 460, 350 S.E. 2d at 906. The court went on to hold that this waiver did not necessarily extend to "opinion testimony." The court noted the strong public policy, as expressed in N.C.G.S. § 8-53, favoring protecting confidentiality between physician and patient. On this basis it held that absent an express waiver, a trial court may permit opinion evidence by nonparty treating physicians only after finding, pursuant to the statute, that the proper administration of justice necessitates such testimony. 83 N.C. App. at 460, 350 S.E. 2d at 906.

The question before us is whether the Court of Appeals erred in establishing a rule whereby plaintiffs who waive their physician-patient privilege as to "information" may nevertheless preclude their physicians from giving opinion testimony. We hold it did.

Communications between physician and patient received no protection at common law. *State v. Martin,* 182 N.C. 846, 849, 109 S.E. 74, 76 (1921). North Carolina protects the physician-patient relationship by statute. N.C.G.S. § 8-53 provides, in pertinent part:

> No person, duly authorized to practice physic or surgery, shall be required to disclose any information which he may have acquired in attending a patient in a professional character, and which information was necessary to enable him to prescribe for such patient as a physician, or to do any act for him as a surgeon, and no such information shall be considered public records under G.S. 132-1. . . . Any resident or presiding judge in the district, either at the trial or prior thereto, or the Industrial Commission pursuant to law may, subject to G.S. 8-53.6, compel disclosure if in his opinion disclosure is necessary to a proper administration of justice.

(1986). Decisions of this Court make clear that the physician-patient privilege extends beyond information orally communicated by the patient to the physician. It also embraces "knowledge obtained by the physician or surgeon through his own observation or examination while attending the patient in a professional capacity, and which was necessary to enable him to prescribe." *Smith v. Lumber Co.*, 147 N.C. 62, 64, 60 S.E. 717, 718 (1908). Beyond this, however, our cases have refused to go. As this Court declared in *Sims v. Charlotte Liberty Mutual Insurance Co.*, "[w]e are not disposed to extend the privilege beyond the plain sense of the text of the statute, but we are required to give effect to that." *Sims*, 257 N.C. 32, 37, 125 S.E. 2d at 326, 330 (1962).

The law is established that a patient may waive his physician-patient privilege. 1 Brandis on North Carolina Evidence § 63 (1962). The waiver may be express or implied. *Capps v. Lynch*, 253 N.C. 18, 22, 116 S.E. 2d 137, 141 (1960).

In *Capps*, this Court considered what constitutes waiver by implication, concluding that the issue must be resolved "largely by the facts and circumstances of the particular case on trial." *Capps*, 253 N.C. at 23, 116 S.E. 2d at 141. Certain situations, however, necessarily constitute an implied waiver. Waiver by implication will be found where

the patient calls the physician as a witness and examines him as to patient's physical condition, where patient fails to object when the opposing party causes the physician to testify, or where the patient testifies to the communication between himself and physician.

*Id.* The patient also waives his privilege by implication when he "voluntarily goes into detail regarding the nature of his injuries and either testifies to what the physician did or said while in attendance." *Id.*

The principle underlying our decision in *Capps* is that when a patient discloses, or permits disclosure of, information gained by the physician during the physician-patient relationship, the rationale for the physician-patient privilege evaporates. The purpose of North Carolina's statutory privilege is "to induce the patient to make full disclosure that proper treatment may be

given, to prevent public disclosure of socially stigmatized diseases, and in some instances to protect patients from self-incrimination." *Sims*, 257 N.C. at 36, 125 S.E. 2d at 329. The privilege belongs to the patient. *Capps*, 253 N.C. at 22, 116 S.E. 2d at 141. So long as the patient insists on it, the privilege remains intact. When, however, the patient breaks the fiduciary relationship with the physician by revealing, or permitting revelation of, the substance of the information transmitted to the physician, the patient has, in effect, determined it is no longer important that the confidences which the privilege protects continue to be protected. Having taken this position, the plaintiff may not silence the physician as to matters otherwise protected by the privilege.

In the instant case, the plaintiffs impliedly waived their physician-patient privileges as to each of the treating physicians defendants called as expert witnesses. The consultations between plaintiffs and these physicians received, at plaintiffs' instance or permission, thorough public exposure and scrutiny. Joyce Cates testified on direct examination concerning her communications with these physicians. She recounted her deteriorating physical condition and the corresponding course of treatment the physicians prescribed. Plaintiffs did not object when defendants called these physicians as witnesses and elicited from them detailed descriptions of the nature of plaintiffs' injuries. Applying the test for waiver enunciated by this Court in *Capps*, we conclude the plaintiffs waived their physician-patient privileges as to the nonparty treating physicians whom defendants called as expert witnesses.

We hold further that this waiver extended to any opinions held by these treating physicians formed as a result of information gained during their treatment of the plaintiffs. The distinction between information and opinion drawn by the Court of Appeals has never been made by this Court. Plaintiffs cite no case making a similar distinction, nor have we found any. We decline to draw such a line.

Strictly construing the statute protecting communications between physicians and patients, as required by *Sims*, we find no statutory basis for allowing a patient to waive his privilege as to information gained by his physician while maintaining it as to his physician's opinions. 257 N.C. at 37, 125 S.E. 2d at 330. The

statute itself suggests no division between opinion and information, and no such division is necessary to give effect "to the plain sense of the text." *Id.* As noted already, the statute's plain sense serves to protect a patient from public disclosure of the details of his relationship with his physician. A patient who discloses that which he has a right to keep confidential loses the right to claim the statute's protection.

A second reason that we decline to adopt the divisible waiver permitted by the Court of Appeals is its possible misuse by plaintiffs in personal injury actions. A divisible waiver could enable plaintiffs to elicit from their physicians factual details underlying their cases and then preclude these physicians from placing this information in a legally relevant context. When a patient dissolves the fiduciary relationship with his physician by disclosing or permitting disclosure of details of their consultations, he should not, in fairness, be allowed to prevent the physician from stating an opinion which might aid the trier of fact in assessing the merits of the patient's case. To hold otherwise would enable patients to use the privilege not defensively to protect their confidences but offensively to suppress the truth in litigation. *Capps,* 253 N.C. at 24, 116 S.E. 2d at 142.

Defendants and *amici* suggest that this Court, following the lead of commentators, legislation, and decisions in other jurisdictions, should hold the physician-patient privilege is waived whenever a patient files a lawsuit in which his physical condition is an element of the claim or defense. *See, e.g.,* 8 Wigmore, *Evidence* § 2389 (McNaughton rev. 1961). The concurring opinion argues likewise, noting that this is the rule "in most jurisdictions."[1] Since we have concluded that a waiver occurred under the circumstances of this case on the authority of *Capps,* we decline to go so far. Such a holding would be unnecessarily contrary to the *Capps* test for determining waiver. In *Capps* we declared, "[t]he question of waiver is to be determined largely by the facts and circumstances of the particular case on trial."

1. According to the *amicus* brief submitted by the North Carolina Association of Defense Attorneys, 27 states have this rule by legislative enactment and 6 by judicial decision. *Amicus Curiae Brief,* North Carolina Association of Defense Attorneys, at 11-12.

*Capps*, 253 N.C. at 23, 116 S.E. 2d at 141. This case presents no compelling reason for departing from this test.[2]

For the reasons stated we affirm the Court of Appeals decision as herein modified.

Modified and affirmed.

Justice MITCHELL concurring in result.

I concur in the result reached and in most of the reasoning contained in the scholarly and thoughtful opinion of the majority. I write separately, however, to express my disagreement with the ground upon which the majority resolves the question of the plaintiff's waiver of the physician-patient privilege. The majority follows *Capps v. Lynch*, 253 N.C. 18, 23, 116 S.E. 2d 137, 141 (1960) in applying the rule that questions involving waiver of the physician-patient privilege are to be determined largely by the facts and circumstances of the particular case on trial. I am of the view that *Capps* was wrongly decided on this point and that we should not perpetuate the error further. Accordingly, I would take this opportunity to overrule *Capps* in this regard and apply the rule recognized by a majority of jurisdictions—which I think clearly is the correct rule—that the "*bringing of an action* in which an essential part of the issue is the existence of physical ailment should be a *waiver* of the privilege for all communications concerning that ailment." 8 J. Wigmore, *Evidence* § 2389 (McNaugh-

---

2. Plaintiffs argue that defense counsel, in the preparation of this case, abused plaintiffs' physician-patient privilege by conducting, before trial, ex parte discussions with plaintiffs' treating physicians. We are unable to review these contentions because plaintiffs never pressed this grievance at trial and the trial court made no rulings directed to this point. As we read the record, plaintiffs never objected to the expert opinion testimony, nor moved to strike it, on the ground of the allegedly improper ex parte conferences. There are no assignments of error pertinent to this point. Appellate courts ordinarily do not review matters which were not first considered and ruled on by the trial court.

> The law does not require trial judges to be clairvoyant and omniscient. Neither does it permit defense counsel to play hide and seek with objections. The trial court, upon inquiry, is entitled to know the ground upon which an objection is interposed; and if counsel specifies one ground, he cannot be heard to urge a different ground on appeal.

*State v. Cumber*, 280 N.C. 127, 131, 185 S.E. 2d 141, 144 (1971).

ton Rev. 1961); *see also* Annotation, *Commencing Action Involving Physical Condition of Plaintiff or Defendant or Decedent as Waiving Physician-Patient Privilege as to Discovery Proceedings*, 21 A.L.R. 3d 912 (1968 & Supp. 1987).

The fact that the treating physician's knowledge and the condition of the plaintiff form the central issues in cases such as this, makes information concerning relevant medical treatments and conditions subject to discovery and use at trial. The rule applied in most jurisdictions is that in such cases, the physician-patient privilege is waived when the patient files a lawsuit which places his medical condition in controversy. *See, e.g., Mull v. String*, 448 So. 2d 952 (Ala. 1984); *Trans-World Investments v. Drobney*, 554 P. 2d 1148 (Alaska 1976); *Mathis v. Hildebrand*, 416 P. 2d 8 (Alaska 1966); *Collins v. Bair*, 252 N.E. 2d 448 (Ind. App. 1969); *State ex rel. McNutt v. Keet*, 432 S.W. 2d 597 (Mo. 1986); *DeCastro v. New York*, 54 Misc. 2d 1007, 284 N.Y.S. 2d 281 (1967); *Sagmiller v. Carlsen*, 219 N.W. 2d 885 (N.D. 1974); *Alexander v. Farmers Mutual Auto Ins. Co.*, 25 Wis. 2d 623, 131 N.W. 2d 373 (1964); *Awtry v. United States*, 27 F.R.D. 399 (S.D.N.Y. 1961); *Burlage v. Haudensheild*, 42 F.R.D. 397 (N.D. Iowa 1967).

A lawsuit is not a parlor game; it is a solemn search for truth conducted by a court of law. In my view, the "patient-litigant exception" precludes a party who has placed his medical condition in issue from invoking the physician-patient privilege to prevent the court from reaching the truth of the very issue he has raised. In this regard, a party simply "cannot have his cake and eat it too." *San Francisco v. Superior Court*, 37 Cal. 2d 227, 231 P. 2d 26, 28 (1951) (Traynor, J.).

This case presents a propitious opportunity to overrule our prior erroneous holding in *Capps* and to adopt the "patient-litigant exception" to the physician-patient privilege. By so doing, we would adopt the correct view and bring North Carolina into line with the majority of jurisdictions. This approach would not change the result in the present case, but would serve to give both Bench and Bar advance notice that we were adopting the only fair and just rule for such cases. I vote to do so now.

Justice MEYER joins in this concurring opinion.