STATE OF NORTH CAROLINA v. ANGELA CLAYTON WEST

No. 9010SC900

(Filed 21 May 1991)

1. **Parent and Child § 2.2 (NCI3d) — expert testimony — cause of death — abuse of child — testimony admissible**

In a prosecution of defendant for felony child abuse and murder, the trial court did not err in allowing expert testimony by the emergency room physician, the treating physician at Duke University Medical Center where the child was transferred, and the doctor who performed the autopsy concerning the sodium level in the child's blood, water's effect on the concentration of various substances in the body, the amount of water normally ingested by a child, the amount of water required to reduce the sodium level to that of the victim, their opinions that a child would not ingest that amount of fluid voluntarily and that the child's injury was the result of an intentional physical injury, and bruises on the child's body inconsistent with normal childhood activity. Such testimony was admissible pursuant to rules for admissibility of expert testimony summarized in *State v. Huang*, 99 N.C. App. 658.

**Am Jur 2d, Homicide §§ 398, 399.**

1

STATE v. WEST

[103 N.C. App. 1 (1991)]

2. **Parent and Child § 2.2 (NCI3d); Criminal Law § 34.4 (NCI3d) — felony child abuse and murder charges — previous acts of child abuse — admissibility of evidence**

In a prosecution of defendant for felony child abuse and murder where the evidence tended to show that defendant forced her son to drink a large amount of water, the trial court did not err in allowing evidence of alleged acts of misdemeanor child abuse which defendant and her boyfriend had been charged with four months before the incident in question, since there was no merit to defendant's contention that the incidents testified to were too dissimilar; acts which occurred only four months before were not too remote; the testimony revealed a pattern of severe discipline over a period of several months which would support an inference that defendant's behavior then was still relevant at the time of the offense; and the evidence was not unduly prejudicial.

**Am Jur 2d, Homicide §§ 310 et seq.**

3. **Homicide § 21.9 (NCI3d) — involuntary manslaughter — child forced to drink water — sufficiency of evidence**

Evidence was sufficient to be submitted to the jury in a prosecution for involuntary manslaughter where a reasonable inference could be drawn that defendant's child was forced by defendant to drink such a large amount of water in such a short period of time that it made him violently ill and resulted in his death.

**Am Jur 2d, Homicide §§ 425 et seq.**

4. **Criminal Law § 1148 (NCI4th) — involuntary manslaughter — aggravating factor of especially heinous or atrocious crime — ample supporting evidence**

The trial court did not err in finding as a factor in aggravation for involuntary manslaughter that the offense was especially heinous, atrocious, or cruel where the evidence tended to show that defendant forced her child to drink a large amount of water; the child vomited many times in a short time frame, screamed in pain, and experienced seizures; and this was ample evidence to support a conclusion that the offense involved excessive physical pain not normally associated with the offense of involuntary manslaughter.

**Am Jur 2d, Homicide § 70.**

APPEAL by defendant from judgment entered 30 October 1989 in WAKE County Superior Court by *Judge J. Milton Read, Jr.* Heard in the Court of Appeals 8 April 1991.

Defendant was indicted for felony child abuse and murder of her son, Christopher, in Alamance County. A change of venue was granted, and the trial was held in Wake County.

At trial, the State's evidence tended to show that Christopher died from hyponatremia (a deficiency of sodium in the blood) caused by excessive absorption of water into his system. He had ingested a large amount of water, with testimony indicating that it could have been as much as seven to nine quarts, in a matter of a few hours. Defendant's sometime live-in boyfriend took Christopher to the hospital and told the doctor that he had suffered a seizure and had vomited "dozens" of times. Christopher was flown to Duke University Medical Center, but they were unable to save him. The State also presented evidence from many witnesses tending to show that defendant and her boyfriend would often harshly discipline the child.

Defendant's evidence tended to show that she did tell her son to drink a lot of water but disputed the State's evidence as to the amount which was actually consumed. She testified that Christopher complained that he was not feeling well, so she gave him an aspirin dissolved in tea. She was particularly concerned about a rash she had noticed, so she called the hospital, and then her mother. Her mother told her to give him a lot of liquids. She then discovered that Christopher had eaten some sherbet which she felt might have been tainted. Her boyfriend told her that Christopher might have food poisoning and that they should wash out his system. Christopher vomited several times while in the process of drinking slightly over two quarts of water and complained of a headache. She gave him another aspirin, and when he complained that he could not see, she went to her neighbor's house to call for an ambulance. Her boyfriend wrapped the child in a blanket and took him to the hospital himself.

Defendant was convicted of involuntary manslaughter and non-felonious child abuse. After a sentencing hearing on the involuntary manslaughter charge, the trial court found as factors in aggravation that the victim was very young, the defendant took advantage of a position of trust or confidence to commit the offense, and the offense was especially heinous, atrocious or cruel. It found

as factors in mitigation that the defendant had no previous record of convictions, she exhibited genuine remorse over the death of her son, and she had presented no disciplinary problems since her incarceration. It then sentenced her to ten years in prison, a sentence in excess of the presumptive. Defendant was also sentenced to two years on the non-felonious child abuse conviction.

*Attorney General Lacy H. Thornburg, by Assistant Attorney General Debra C. Graves, for the State.*

*Craig T. Thompson for defendant-appellant.*

WELLS, Judge.

Defendant brings forward fifteen assignments of error for our review. She has not addressed her first, second, seventh, eleventh, or twelfth assignments in her brief, and we therefore deem them abandoned. N.C.R. App. P., Rule 28. Her remaining assignments deal with the propriety of certain expert testimony, testimony dealing with prior acts of conduct, the failure of the trial court to dismiss the charges at the end of the State's evidence and at the close of all the evidence, and the trial court's finding that the offense was especially heinous, atrocious, or cruel. We find no error.

## Expert Testimony

[1] In *State v. Huang,* 99 N.C. App. 658, 394 S.E.2d 279, *disc. review denied,* 327 N.C. 639, 399 S.E.2d 127 (1990), we summarized the rules regarding the admissibility of expert testimony. The following are relevant to those errors assigned by defendant:

1. The expert must be better qualified than the jury to render the opinion regarding the particular subject based on his knowledge, skill, experience, training, or education.

2. The testimony of the expert must be helpful.

3. The expert's scientific technique on which he bases his opinion must be reliable.

4. The evidence must be relevant.

5. Its probative value must not be outweighed by the dangers of unfair prejudice, confusion, misleading the jury, or needless presentation of cumulative evidence.

6. The expert's opinion is not inadmissible solely because it embraces an ultimate issue, but the expert must not be allowed to testify that a particular legal conclusion or standard has or has not been met. (Citations omitted).

We will apply these principles to the testimony of each expert and the errors defendant has assigned *seriatim*.

*Dr. Paul Mele*

Dr. Mele was the emergency room physician who first treated Christopher. He was tendered and received by the court without objection as an expert "in the field of medicine specializing in emergency medicine." He testified that his treatment of Christopher revealed that he had a sodium level of 116, and that the normal range is between 135 and 145. After testifying in detail as to water's effect on the concentration of various substances in the body, Dr. Mele stated that in his opinion, Christopher had absorbed four liters or quarts of water into his body, and that he would have had to ingest a large amount of water in a very short time to achieve that level of absorption in light of the normal urinary processes and the fact that Christopher had been vomiting. In his opinion, no child or adult would ingest that amount of fluid voluntarily.

Defendant contends that the court erred in admitting this testimony and that Dr. Mele was allowed to speculate based on unknown or incorrect variables. Our review of Dr. Mele's testimony does not persuade us that the opinions he expressed were "speculation." He explained in great detail how water affects the concentration of the different substances which make up the body, particularly sodium. He also explained how water could be removed from the body, or the thirst mechanism activated, in order to maintain proper levels. His opinion as to the amount of water absorbed was the result of "a fairly straightforward, mathematical calculation" based on these principles, a method of calculating which has been "established for a long time and shown to be rather valid through use in daily practice of medicine." Defendant's contention that Dr. Mele admitted to speculating by stating that the figure was a relatively educated guess is without merit. The use of the word "guess" does not render an opinion inadmissible. *State v. Clayton*, 272 N.C. 377, 158 S.E.2d 557 (1968). We view Dr. Mele's choice of words as merely indicating that there was a margin of error (somewhere between ten and twenty percent) in his calcula-

tions. The existence of this margin of error also does not affect the admissibility of his testimony. *State v. Pridgen*, 313 N.C. 80, 326 S.E.2d 618 (1985); *State v. Catoe*, 78 N.C. App. 167, 336 S.E.2d 691 (1985), *disc. review denied*, 316 N.C. 380, 344 S.E.2d 1 (1986).

Defendant's contention that Dr. Mele's testimony should have been excluded as based on incorrect assumptions is also without merit. Defendant points to Dr. Mele's testimony that Christopher had produced only about three tablespoons of urine in roughly two hours in the emergency room as evidence that his kidneys were not functioning properly. We do not perceive this testimony as compelling the conclusion that Christopher had a renal problem. This factor would also support the inference that his kidneys were beginning to fail *at that time*. Defendant's reliance on the fact that Christopher's tests revealed that his glucose was high and that he had an increased white blood count also does not render this testimony inadmissible, despite the fact that the prosecuting attorney phrased his questions in terms of "normal functions" in "normal, healthy children." Defendant did not demonstrate either at trial or before this Court how these factors rendered Dr. Mele's testimony inherently unreliable or unhelpful to the jury. This also applies to defendant's reliance on the fact that Christopher was connected to I.V. fluids when he entered the emergency room. The injection he notes contained 5 grams of dextrose in 100 cc's of water (roughly 3-4 ounces). At most, these factors would affect the weight to be given the doctor's opinions, rather than their admissibility.

Finally, defendant contends that the court erred in allowing Dr. Mele to testify that a child would not drink enough water to result in the amount which Christopher absorbed "voluntarily." Dr. Mele testified on cross-examination that "voluntarily" to him meant as the result of the thirst mechanism. As .noted earlier, Dr. Mele testified at great length about the thirst mechanism, and the body's tendency to adjust water level to maintain the proper concentration of substances such as sodium. We find this evidence to be well within the doctor's area of expertise and helpful to the jury. We note that the prosecuting attorney's efforts to have the doctor state that one method by which a child could be made to drink so much water was by physical force was excluded by the trial court. Those assignments of error relating to Dr. Mele's testimony are overruled.

*Dr. John Boyd*

Dr. Boyd testified much to the same effect as Dr. Mele. He treated Christopher at Duke University Medical Center. He was tendered and accepted as an expert in "medicine specializing in pediatric critical care." Dr. Boyd testified variably that Christopher absorbed four quarts, six quarts, and from four to six quarts of water to reduce his sodium level to 116. He also testified that, based on this figure, and the history given to him by defendant, Christopher ingested from seven to nine quarts over a two to three hour period, and perhaps more depending on how much was vomited. He stated that the usual requirement in a child Christopher's age was roughly 1½ quarts a day, and opined that no child would drink that much water voluntarily. Finally, he stated that in his opinion, Christopher's condition was the result of an intentional physical injury.

Defendant challenges Dr. Boyd's testimony on much the same grounds as she does Dr. Mele's. While Dr. Boyd's testimony was not as well developed as Dr. Mele's, we find it also not speculative. Dr. Boyd testified about the effect of excess water in the body, and stated that he was basing his opinion as to the amount absorbed on Christopher's serum sodium level when he was admitted to Alamance County Hospital compared with the normal low level of sodium of 135, his estimated weight (Christopher's physical condition at the time he was treated precluded actually weighing him), and the distribution of sodium throughout the body. He modified his original statement of four quarts after factoring in the fact that Christopher's serum sodium level increased to 144 while he was in the hospital, which indicated a normal sodium level of 142-146. He based his estimate of the time and amount of liquid ingested on the history of events given him by defendant and the body's normal excretion rate of one quart per hour. We perceive no error in admitting these statements of opinion. *See Powell v. Parker*, 62 N.C. App. 465, 303 S.E.2d 225, *disc. review denied*, 309 N.C. 322, 307 S.E.2d 166 (1983). Defendant's contention that these opinions were based on inadequate facts and data is untenable. Dr. Boyd knew when defendant claimed to have begun giving Christopher water to drink, knew approximately how much water Christopher's body had absorbed, and knew how fast the body could excrete water.

Defendant also contends that Dr. Boyd's opinions were based on inaccurate assumptions. He testified, however, that the examina-

tion performed at Duke showed that Christopher had no kidney problems. The other alleged health problems and the effect (if any) of the injection of the glucose solution again would go to the weight accorded to Dr. Boyd's testimony, rather than its admissibility.

We are more troubled by the following excepted-to exchange:

Q. Dr. Boyd, based on the history you obtained, your examinations of Christopher West and his course while in the hospital at Duke University Medical Center, do you have an opinion satisfactory to yourself and to a reasonable degree of medical certainty whether Christopher's condition on arrival at Duke University Medical Center was the result of intentional physical injury?

A. Yes, I do.

Q. What is that opinion?

A. I believe that his injury was the result of an intentional injury.

Defendant strenuously contests this exchange as allowing the doctor to give his expert opinion as to her guilt or innocence, and in the alternative as unduly more prejudicial than probative. Our appellate courts have held that, based on a child's clinical presentation and history, a medical expert may testify that the wounds presented are inconsistent with accidental origin. *See State v. Brown*, 300 N.C. 731, 268 S.E.2d 201 (1980); *State v. Wilkerson*, 295 N.C. 559, 247 S.E.2d 905 (1979). The question and answer in this case falls under this general rule. The assignments of error related to Dr. Boyd's testimony are overruled.

*Dr. Thomas Clark*

Dr. Thomas Clark performed the autopsy. He was tendered and received as "an expert medical doctor specializing in the field of forensic pathology." Dr. Clark testified about many bruises he found on the body, and opined that they were not consistent with normal childhood activity. Defendant contends that this testimony was irrelevant, inflammatory, and beyond the witness' area of expertise.

The testimony was relevant to the State's theory that Christopher died as the result of one act in a continuing pattern of child abuse. The trial court exercised control over the testimony by refusing to allow the admission of a photograph of bruises visible

under the rolled back skin of the child's skull. Finally, Dr. Clark testified that he had performed over 800 autopsies, including some on children. He explained his opinions as based on the location and severity of the bruises. This testimony was properly admitted. *See Wilkerson, supra.*

### Prior Acts Testimony

[2] Defendant moved before trial to exclude evidence of any alleged acts of misdemeanor child abuse with which she and her boyfriend had been charged in June 1988. The charges were dismissed in August for lack of evidence. N.C. Gen. Stat. § 8C-1, Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

This rule is a general rule of inclusion of such evidence, subject to an exception if its only probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged. *State v. Coffey*, 326 N.C. 268, 389 S.E.2d 48 (1990). The State contends that this evidence was relevant to show defendant's intent and motive when she had Christopher drink the water. When prior incidents are offered for a proper purpose, the ultimate test of admissibility is whether they are sufficiently similar and not so remote as to run afoul of the balancing test between probative value and prejudicial effect set out in Rule 403. *State v. Richardson*, 100 N.C. App. 240, 395 S.E.2d 143, *disc. review denied*, 327 N.C. 641, 399 S.E.2d 332 (1990); N.C. Gen. Stat. § 8C-1, Rule 403.

Intent is a mental attitude seldom provable by direct evidence. *See State v. Wilson*, 315 N.C. 157, 337 S.E.2d 470 (1985). Our courts have consistently held that past incidents of mistreatment are admissible to show intent in a child abuse case. *See State v. Hitchcock*, 75 N.C. App. 65, 330 S.E.2d 237, *disc. review denied*, 314 N.C. 334, 333 S.E.2d 493 (1985); *State v. Vega*, 40 N.C. App. 326, 253 S.E.2d 94, *disc. review denied*, 297 N.C. 457, 256 S.E.2d 809, *cert. denied*, 444 U.S. 968, 62 L.Ed.2d 382 (1979). Defendant contends that the testimony in this case should have been excluded as refer-

ring to incidents which were remote, dissimilar to the act she was alleged to have committed at trial, not amounting in law to child abuse, and unfairly prejudicial. We disagree.

We note initially that prior acts testimony need not involve incidents for which the defendant was actually convicted of a crime. *State v. Suggs*, 86 N.C. App. 588, 359 S.E.2d 24, *cert. denied*, 321 N.C. 299, 362 S.E.2d 786 (1987). Defendant's contention that the incidents testified to were too dissimilar is also without merit. The State was attempting to prove that defendant forced Christopher to drink so much water as a form of discipline. Evidence of the way defendant had treated the child in the past was certainly relevant, despite the fact that no witness testified that defendant had ever attempted this particular action before.

Defendant also contends that the events were too remote. The passage of time must play an integral part in the initial balancing process which the trial court undertakes in determining admissibility of such evidence. *State v. Jones*, 322 N.C. 585, 369 S.E.2d 822 (1988). In this case, the bulk of the testimony concerned acts which occurred before defendant was arrested and charged with child abuse in June 1988, four months before these events. In *State v. Faircloth*, 99 N.C. App. 685, 394 S.E.2d 198 (1990), we allowed prior acts testimony of three incidents which had occurred within 28 months before the act complained of. In this case, defendant had been counselled as to how to improve her parenting skills and alternative forms of discipline, which would tend to support an inference that the acts testified to were a problem from her past which she had overcome. The testimony in this case, also, however, revealed a pattern of severe discipline over a period of several months, which would support an inference that her behavior then was still relevant. While the better practice would be to make findings of fact in a case such as this which would better reveal the trial court's reasoning, defendant has not made the lack of these findings the basis of an assignment of error. *See Suggs, supra.* We hold that this evidence was not so remote as to mandate its exclusion.

Finally, defendant contends that this evidence was unduly prejudicial, and should have been excluded for that reason. Having found that the evidence was not too dissimilar or remote to require its exclusion, we also note that the trial court went to great lengths to balance the need of the State to corroborate the testimony

of its witnesses with the rights of the defendant by excluding cumulative testimony, evidence related to her treatment of her other children, and evidence of her boyfriend's actions which she witnessed, but did not participate in. Those assignments of error related to testimony of prior acts are overruled.

## Remaining Assignments

[3] Defendant contends that the trial court erred in failing to dismiss the charges of involuntary manslaugher against her due to insufficient evidence at the close of the State's evidence and at the close of all the evidence. Since defendant presented evidence, we deal only with the ruling on the motion to dismiss at the close of all the evidence. *State v. Bullard*, 312 N.C. 129, 322 S.E.2d 370 (1984). A motion to dismiss presents the questions of whether there is substantial evidence of each essential element of the crime charged or of a lesser included offense, and whether the defendant was the perpetrator. *State v. Scott*, 323 N.C. 350, 372 S.E.2d 572 (1988). The evidence must be considered in the light most favorable to the State, with the State receiving the benefit of every reasonable inference to be drawn from it. *Bullard, supra.*

Defendant was originally charged with murder. She was acquitted of first and second degree murder and convicted of involuntary manslaughter. Any error in submitting the charges of first and second degree murder was thereby rendered harmless, absent some showing how submitting these charges prejudiced defendant in some way. *State v. Berkley*, 56 N.C. App. 163, 287 S.E.2d 445 (1982). Defendant has made no such showing.

Involuntary manslaughter is the unlawful killing of a human being without malice, without premeditation and deliberation, and without intention to kill or inflict serious bodily injury. *See State v. Greene*, 314 N.C. 649, 336 S.E.2d 87 (1985) and cases cited therein; *State v. Lawrence*, 94 N.C. App. 380, 380 S.E.2d 156, *disc. review denied*, 325 N.C. 548, 385 S.E.2d 506 (1989). Involuntary manslaughter has also been defined as the unintentional killing of a human being without malice proximately caused by (1) an unlawful act not amounting to a felony nor naturally dangerous to human life, or (2) a culpably negligent act or omission. *Greene, supra, citing State v. Redfern*, 291 N.C. 319, 230 S.E.2d 152 (1976). "It is the absence of malice, premeditation, deliberation, intent to kill, and *intent* to inflict serious bodily injury that separates involuntary man-

slaughter from murder and voluntary manslaughter." *Greene, supra.* (Emphasis added).

From the evidence in this case, a reasonable inference could be drawn that Christopher was forced to drink such a large amount of water in such a short period of time that it made him violently ill and resulted in his death. This evidence was sufficient to establish the culpable negligence required to submit the charge of involuntary manslaughter to the jury. Defendant's contention that this charge should not have been submitted because the cause of death is rare is completely without merit. We also note that defendant does not argue the sufficiency of the evidence to support the conviction for non-felonious child abuse in her brief. A violation of the misdemeanor child abuse statute proximately resulting in death would support a conviction of involuntary manslaughter. *State v. Darby*, 102 N.C. App. 297, 401 S.E.2d 791 (1991). This assignment of error is overruled.

[4] Finally, defendant assigns error to the trial court's finding as a factor in aggravation of the involuntary manslaughter conviction that the offense committed was especially heinous, atrocious, or cruel. Defendant contends that the trial court made no findings to support this finding, and there was insufficient evidence presented at trial which would support it. We disagree.

There is no requirement that the trial court set out particularized findings in support of those factors which it finds in aggravation. *State v. Abee*, 60 N.C. App. 99, 298 S.E.2d 184 (1982), *modified and affirmed*, 308 N.C. 379, 302 S.E.2d 230 (1983). Each factor must be supported by a preponderance of the evidence. *Id.* The evidence in this case tended to show that Christopher vomited many times in a short time frame, screamed in pain, and experienced seizures. This was ample evidence to support a conclusion that the offense involved excessive physical pain not normally associated with the offense of involuntary manslaughter. *See State v. Shadrick*, 99 N.C. App. 354, 393 S.E.2d 133 (1990). This assignment of error is overruled.

For the above-stated reasons, we find

No error.

Chief Judge HEDRICK and Judge EAGLES concur.