JACKSON "ROCK" PINCKNEY, Plaintiff/Cross-Appellant v. JEAN CLAUDE VAN
DAMME, Defendant/Appellant

No. 9312SC785

(Filed 6 September 1994)

1. **Workers' Compensation § 69 (NCI4th)— injury suffered while filming movie—action by fellow employee—intentional negligence**

   The trial court did not abuse its discretion by denying defendant's motion for judgment notwithstanding the verdict in an action to recover damages for injuries sustained during the filming of a movie where plaintiff had received workers' compensation benefits and thereafter filed this action alleging that defendant, a fellow employee of Cannon Films, Inc., had engaged in willful and wanton, negligent and reckless conduct in striking plaintiff. The jury could conclude that defendant was reckless or manifestly indifferent to the consequences of his conduct and that he intentionally breached his duty to use ordinary care not to injure plaintiff from evidence that defendant, in this and other movies, had injured other actors, stunt people and extras and had been warned not to make excessive, injurious contact with those people; defendant made contact with plaintiff during rehearsal of this scene and was warned not to do so; defendant held his knife open during the actual filming, rather than in the "tucked" position in which it was supposed to have been held; and there was ample evidence that defendant wanted his fight scenes to look as authentic and realistic as possible and that he had a reputation for engaging in excessive contact in order to do so.

   **Am Jur 2d, Workers' Compensation §§ 100, 101.**

   **What conduct is willful, intentional, or deliberate within workmen's compensation act provision authorizing tort action for such conduct. 96 ALR3d 1064.**

   **Willful, wanton, or reckless conduct of co-employee as ground of liability despite bar of workers' compensation law. 57 ALR4th 888.**

PINCKNEY v. VAN DAMME

[116 N.C. App. 139 (1994)]

2. **Trial § 533 (NCI4th)— intentional negligence—movie stunt—perception of out-of-court information received by juror—motion for new trial denied**

The trial court did not abuse its discretion by denying defendant's motion for a new trial based on juror misconduct where plaintiff alleged that defendant had engaged in willful and wanton, negligent and reckless conduct in striking plaintiff during a movie stunt; the foreperson sent a note to the judge during deliberations expressing concern that one juror had visited a karate school, discussed the case with an instructor, watched news reports of the trial, and discussed it with her husband; defendant's motion for an immediate mistrial was denied; each juror was examined by the trial court and counsel in chambers and on the record after a verdict against defendant; and defendant's motions for a judgment notwithstanding the verdict and a new trial were denied. The examination of the jurors supports the trial court's conclusion that Juror No. 12's actions in going to the karate school, observing the news with the sound turned down, and seeing her husband do a "crescent kick" caused no actual prejudice to defendant. All of the jurors in this case indicated that their deliberations and verdict were based solely and entirely on the evidence, the arguments of counsel, and the charge of the court, and were not affected by any extraneous information provided by the one juror.

**Am Jur 2d, Trial § 1953.**

3. **Evidence and Witnesses § 336 (NCI4th)— injury during movie stunt—willful and wanton conduct—prior acts with others—admissible**

The trial court did not abuse its discretion in admitting evidence regarding defendant's prior acts in engaging in excessive conduct with other co-employees and his reputation created thereby in an action for damages from an injury suffered during a movie stunt where plaintiff alleged willful and wanton, negligent and reckless conduct by defendant. The evidence was probative of defendant's motive, intent and the absence of mistake and was admissible under N.C.G.S. § 8C-1, Rule 404(b).

**Am Jur 2d, Evidence §§ 404 et seq., 435 et seq., 447.**

**Admissibility of evidence of other crimes, wrongs, or acts under Rule 404(b) of Federal Rules of Evidence, in civil cases. 64 ALR Fed. 648.**

**4. Judgments § 43 (NCI4th)— judgment entered out of session, term and county—proceedings held in session and in district—no error**

The trial court did not err by entering judgment out of session, out of term, and out of county where the session ended on 26 February 1993; the clerk entered the verdict on the minutes, but the court directed plaintiff's counsel to prepare the judgement, precluding application of the automatic entry provision of N.C.G.S. § 1A-1, Rule 58; and the written judgment was signed on 2 April, but was not marked filed until 21 July 1993. The proceedings to which the judgment relates were held and concluded prior to the expiration of the session and in the district. Under *Capital Outdoor Advertising v. City of Raleigh*, 337 N.C. 150, N.C.G.S. § 1A-1, Rule 6(c) provides that the expiration of the court's session has no effect on the power of the court to do any act or take any proceeding, which clearly allows a superior court judge to sign a written order out of session without the consent of the parties so long as the hearing to which the order relates was held in term.

**Am Jur 2d, Judgments §§ 58 et seq.**

Appeal by defendant from judgment entered 25 February 1993 and from the order denying defendant's motions for judgment notwithstanding the verdict and for new trial both entered 29 April 1993 by Judge Coy E. Brewer, Jr., in Cumberland County Superior Court. Heard in the Court of Appeals 15 April 1994.

Plaintiff brought this civil action to recover damages for injuries sustained on 12 July 1988 during filming of the motion picture "Cyborg" in Wilmington, North Carolina. Plaintiff was hired by Cannon Films, Inc., as a "special ability talent," to play the part of a villain in the motion picture which starred defendant Jean Claude Van Damme. Plaintiff was not a professional actor or stuntman but was a body-builder and member of the United States Army who was hired based upon his body type. On the night of 11 July and early morning of 12 July 1988, during a "night shoot" plaintiff and defendant were to stage a fight scene, during which plaintiff was to run through standing water, come to a stop and swing toward defendant with a rubber prop knife. Defendant was then to simulate kicking the knife with his left foot out of plaintiff's right hand and to then "slash" plaintiff's throat with his right hand, "beheading" plaintiff with a plastic prop knife. After the movie director and stunt coordinator discussed with

plaintiff and defendant how the scene would be shot, the parties rehearsed the scene several times. Although never rehearsed that way, the actual scene was filmed under simulated thunderstorm conditions of high winds, lightening, smoke, fire and rain created by machines. Strobe lights were also used. Plaintiff was given a "mark" on the ground where he was to stop after he ran up to attack defendant in the scene at issue. During the actual filming, the prop knife in defendant's right hand struck plaintiff in his left eye resulting in permanent loss of vision in that eye. Plaintiff was subsequently medically discharged from the United States Army.

After he was injured, plaintiff received workers' compensation benefits from Cannon. Thereafter, he filed this civil action against defendant alleging that defendant engaged in willful and wanton, negligent and reckless conduct in striking plaintiff. Defendant answered, interposing multiple defenses and denying the material allegations of the complaint.

The trial began on 15 February 1993 and the evidence was concluded on 22 February 1993. During the jury deliberations, which began the following day, the foreperson sent a note to the judge expressing concern that one juror had visited a karate school and discussed the case with an instructor and had watched news reports of the trial and discussed it with her husband. Defendant's motion for an immediate mistrial was denied. On 25 February 1993, the jury returned a verdict against defendant in the amount of $487,500 in compensatory damages. After the verdict, each juror was examined by the trial court and counsel in chambers, on the record, as to their knowledge of juror misconduct. Defendant subsequently filed a motion for judgment notwithstanding the verdict pursuant to G.S. § 1A-1, Rule 50(b) and a motion for a new trial pursuant to G.S. § 1A-1, Rule 59. Both motions were denied. Defendant appealed from the order denying his post trial motions and from the judgment entered upon the verdict.

*Beaver, Holt, Richardson, Sternlicht, Burge & Glazier, P.A., by H. Gerald Beaver and Harold Lee Boughman, Jr., for plaintiff-appellee.*

*Millberg & Gordon, P.L.L.C., by John C. Millberg, for defendant-appellant.*

MARTIN, Judge.

Defendant argues on appeal that the trial court erred (1) in denying his motion for judgment notwithstanding the verdict because the evidence was insufficient to support a finding of willful, wanton and reckless misconduct, (2) in denying defendant's motion for new trial based on juror misconduct, (3) in denying defendant's motion for new trial on the ground that reputation evidence was improperly admitted, and (4) by entering judgment out of session, out of term, and out of county. We find no reversible error.

[1] Defendant first argues that the trial court erred by denying his motion for judgment notwithstanding the verdict because the evidence was insufficient to support a finding of willful, wanton and reckless misconduct so as to avoid the exclusivity provisions of the Workers' Compensation Act. In reviewing a ruling upon a motion for judgment notwithstanding the verdict made pursuant to G.S. § 1A-1, Rule 50, the evidence must be viewed in the light most favorable to the non-movant "deeming all evidence which tends to support his position to be true, resolving all evidentiary conflicts favorably to him and giving the non-movant the benefit of all inferences reasonably to be drawn in his favor." *Daughtry v. Turnage*, 295 N.C. 543, 544, 246 S.E.2d 788, 789 (1978). A motion to set aside the verdict as being against the greater weight of the evidence is directed to the sound discretion of the presiding judge, whose ruling is not reviewable on appeal in the absence of abuse of discretion. *Nytco Leasing v. Southeastern Motels*, 40 N.C. App. 120, 252 S.E.2d 826 (1979).

Although the Workers' Compensation Act provides the exclusive remedy when an employee is injured in the course of his employment by the ordinary negligence of co-employees, *Abernathy v. Consolidated Freightways Corp.*, 321 N.C. 236, 362 S.E.2d 559 (1987), *reh'g denied*, 321 N.C. 747, 366 S.E.2d 855 (1988), the Act does not preclude suits against co-employees for intentional torts. *Andrews v. Peters*, 55 N.C. App. 124, 284 S.E.2d 748 (1981), *disc. review denied*, 305 N.C. 395, 290 S.E.2d 364 (1982). Injury to another resulting from willful, wanton and reckless negligence is treated as intentional injury for purposes of the Act. *Pleasant v. Johnson*, 312 N.C. 710, 325 S.E.2d 244 (1985). Our Supreme Court has explained the concept of willful, wanton and reckless negligence:

> The concept of willful, reckless and wanton negligence inhabits a twilight zone which exists somewhere between ordinary negligence and intentional injury. The state of mind of the perpe-

trator of such conduct lies within the penumbra of what has been referred to as "quasi intent." . . .

We have described "wanton" conduct as an act manifesting a reckless disregard for the rights and safety of others. The term "reckless," as used in this context, appears to be merely a synonym for "wanton"' and has been used in conjunction with it for many years . . . .

The term "willful negligence" has been defined as the intentional failure to carry out some duty imposed by law or contract which is necessary to the safety of the person or property to which it is owed . . . .

Constructive intent to injure may also provide the mental state necessary for an intentional tort. Constructive intent to injure exists where conduct threatens the safety of others and is so reckless or manifestly indifferent to the consequences that a finding of willfulness and wantonness equivalent in spirit to actual intent is justified. Wanton and reckless negligence gives rise to constructive intent.

*Id.* at 714-15, 325 S.E.2d at 247-48. (Citations omitted.)

When considered in the light most favorable to him, plaintiff's evidence tended to show the following: Blaise Loong, the sword and martial-arts consultant for the film "Cyborg," and an actor and stuntman, testified that generally there is a goal to avoid actual physical contact between weapons and individuals when filming fight scenes. Several other stuntmen and actors in "Cyborg" complained to Loong about excessive contact from defendant in fight scenes. Elizabeth Featherston, a casting agent for "Cyborg" testified that based upon conversations with others on the set of "Cyborg," defendant had a widely discussed overall reputation of making unnecessary contact with people and hurting them. Charles Allen, another special ability talent for the film and ranked as a first degree black belt in karate, testified that during the rehearsal of fight scenes he noticed a considerable amount of unplanned contact being made by defendant who did not appear to be "pulling his punches," by stopping his punches before they made impact, a skill learned in karate. Allen also testified that other cast members complained about defendant not "pulling his punches," and that defendant had a reputation for engaging in a pattern of near contact or contact designed to create realism in filming fight scenes in "Cyborg." From observing the scene at issue between

defendant and plaintiff, Allen believed that defendant was not concerned whether he had contact with plaintiff because his only concern was to "do his movie."

Martha Lee, the owner of the casting company that supplied special ability talent for "Cyborg," observed an extra, who had a role in the movie similar to plaintiff's, who suffered injuries to his leg and side and told her that defendant had hit him. Lee made a formal complaint and spoke with other members of the production staff. Lee discovered that defendant was purposely making physical contact on a regular basis to make the movie more realistic. Another of the cast members told Lee that defendant hit him but he did not want to be a "crybaby." After Lee's complaint and before plaintiff's injury, Tom Elliot, the stunt coordinator of "Cyborg" told her that defendant had been warned and that there would be no more contact on the set. Linda Pickett, a Cannon Films employee who prepared food for the crew, observed a fight scene between defendant and Blaise Loong during which defendant pushed Loong up against a concrete pillar as the scene called for, but with what Pickett assumed was "much more force than necessary because of the loud noise when the guy [Loong] hit the pillar, because of [sic] expression on his face and because of the expressions on everyone else's faces." Loong was pretty upset and the next day showed her a bruise he had acquired from the incident. Pickett also stated that based upon discussions she had with other stunt people and special ability talent in the movie, defendant had a reputation for using more force than needed to "make it look good for the camera." Timothy Baker, a karate expert who worked as an actor with defendant in an earlier film testified that defendant had kicked him very hard during a fight scene. Baker, the production manager and the director all asked defendant to try and hold back the contact, but defendant just shrugged and kept kicking him. Defendant kicked Baker in the groin so hard that he could not get up for over five minutes.

During a rehearsal of defendant's fight scene with plaintiff, defendant kicked plaintiff's hand and came so close to his face with a prop knife that plaintiff could feel the wind. The director, Albert Pyun, told defendant that he had come too close; defendant made no response. During the actual filming of the scene, defendant made physical contact when he kicked plaintiff's right hand, and, although defendant had been instructed to hold his knife in a tuck close to his forearm, he held it up and struck plaintiff's eye with the knife. Plain-

tiff fell into the water and grabbed his face. Plaintiff testified that defendant just stood there and did not say anything or help him.

John Taylor, a journalist, testified that he interviewed defendant for an article that appeared in the 1 April 1991 edition of New York Magazine during which defendant expressed his preference for doing fight scenes in Asia where "guys [are] not afraid to touch, really fight, go for it. Because when you do slow motion you have to see," and that "[i]n America when you do it you have, like, union and, 'Oh, I'm going to sue.' " The article reported that defendant said his fight scenes were so real, he did not dare stage them in the United States.

In summary, plaintiff's evidence demonstrated that in filming "Cyborg" and other movies defendant had injured other actors, stunt people and extras and had been warned not to make excessive, injurious contact with those people, which warnings he often ignored. During rehearsal of the scene at issue, defendant made physical contact with plaintiff and was warned not to do so. Also, during the actual filming of that scene defendant held his knife open, instead of in the "tucked" position in which it was supposed to have been held. There was ample testimony that defendant wanted his fight scenes to look as authentic and realistic as possible and that he had a reputation for engaging in excessive contact in order to do so. From this evidence a jury could conclude that defendant was reckless or manifestly indifferent to the consequences of his conduct and that he intentionally breached his duty to use ordinary care not to injure plaintiff. *Pendergrass v. Card Care, Inc.*, 333 N.C. 233, 424 S.E.2d 391 (1993). (Mere knowledge by coworkers of dangerous condition did not support inference of intent to injure or manifest indifference.) *Abernathy, supra.* (Evidence that co-employees were aware that a tow motor was brakeless, but thought that it could be stopped without brakes by using foot pedal, had seen numerous employees operate it in such a manner, and tow motor had been stopped by using the foot pedal just moments before the accident supported only a finding of ordinary negligence, rather than willful, wanton, and reckless conduct.) *Pleasant, supra.* (Employee's allegations that co-employee had been willfully, wantonly, and recklessly negligent in driving vehicle very close to employee as part of prank were sufficient to state cause of action.) *Dunleavy v. Yates Construction Co.*, 106 N.C. App. 146, 416 S.E.2d 193, *disc. review denied*, 332 N.C. 343, 421 S.E.2d 146 (1992). (Project foreman not liable for death of employee when trench collapsed where evidence showed that foreman's conduct, although arguably negligent in not supervising every portion of work

PINCKNEY v. VAN DAMME

[116 N.C. App. 139 (1994)]

site being worked by inexperienced crew, was not willful, wanton, and reckless.) Accordingly we find no abuse of discretion in the denial of defendant's motion for judgment notwithstanding the verdict.

[2] In his second argument, defendant contends that the trial court erred by denying his motion for a new trial based on juror misconduct. On the morning of 24 February 1993, the second day of jury deliberations, the court received the following handwritten note from the jury foreperson ("Juror No. 4"):

> Several jurors feel one juror sitting on the jury has disobeyed the Court's orders and feel this should be brought to your attention. They have visited a karate school and discussed this with an instructor plus has [sic] been discussing it with their spouse. Also admitted to watching the news with the volume down. This was admitted when I confronted them about it. Thank you.

After discussing the matter with counsel on the record in the absence of the jury, the trial court instructed the jury that its verdict should be based solely upon the evidence presented in the courtroom. Defendant's motion for a mistrial was denied. Directly following the verdict, the court, with counsel, conducted an extensive, in-chambers, individual examination of each juror which was transcribed by the court reporter. In its order denying defendant's Rule 59 motion for a new trial, the court made the following pertinent findings:

9.  Based upon the examination of the jurors and affidavits submitted by the parties, the Court finds that no improper independent external investigation was conducted by any juror.

10. The Court finds, however, that one juror did visit a karate school and that statements were made in the jury room by this juror which reasonably conveyed to some jurors the existence of an apparent external investigation arising from the juror's visit to a karate school. The Court further finds that such statements were in fact perceived by some jurors as evidence obtained from an independent external investigation, even though such investigation did not occur.

11. The Court finds that by the final morning of deliberations, some jurors became aware from various sources, that a motion for mistrial had been made based upon juror misconduct and that three jurors were aware that the motion had been made by the defendant. At this time, all matters except punitive damages

had been resolved and this issue was resolved in favor of the defendant. There is no reasonable possibility of prejudice based upon this information.

12. The Court finds that while no actual extraneous information was brought to the attention of the jurors, what some jurors perceived to be extraneous information was, in fact, brought to the attention of some jurors.

13. The Court finds that . . . the post-verdict examination of the jurors demonstrates the absence of any actual prejudice to the defendant. Absence of any actual prejudice to the defendant is further based upon evidence introduced at trial with substantially the same information as contained in the juror's statements and that therefore such statements were cumulative in nature.

The trial court concluded that there was no presumption of prejudice which arises in a civil action from a showing that extraneous information or perceived extraneous information is improperly brought to the jury's attention, and that no new trial would be allowed on such grounds unless the moving party demonstrated actual prejudice. The court found that defendant had not demonstrated actual prejudice and denied his motion for a new trial.

The granting or denial of a motion for new trial rests within the sound discretion of the trial judge, and his ruling will not be disturbed on appeal in the absence of a manifest abuse of such discretion or determination that his ruling is clearly erroneous. *Stone v. Baking Co.*, 257 N.C. 103, 125 S.E.2d 363 (1962); *Bryant v. Thalhimer Brothers, Inc.*, 113 N.C. App. 1, 437 S.E.2d 519 (1993), *disc. review denied*, 336 N.C. 71, 445 S.E.2d 29 (1994). Our Supreme Court has held:

In North Carolina, in instances where the contention was made by the defendant that the jury has been improperly influenced, it has been held that it must be shown that the jury was actually prejudiced against the defendant, to avail the defendant relief from the verdict, and the findings of the trial judge upon the evidence and facts are conclusive and not reviewable.

*State v. Hart*, 226 N.C. 200, 203, 37 S.E.2d 487, 489 (1946); *State v. Gilbert*, 47 N.C. App. 316, 319-20, 267 S.E.2d 378, 380 (1980).

Although it is the general rule that, once rendered, a verdict may not be impeached by the jurors, G.S. § 8C-1, Rule 606(b) permits testimony

by a juror as to whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. *State v. Lyles*, 94 N.C. App. 240, 380 S.E.2d 390 (1989). A juror may not, however, testify as to the subjective effect of the extraneous information upon the jury's decision. *Id.* "Extraneous information" is information dealing with the defendant or the case being tried, which information reaches a juror without being introduced in evidence and does not include information which a juror has gained in his experience which does not deal with the particular defendant or the case being tried. *State v. Rosier*, 322 N.C. 826, 370 S.E.2d 359 (1988). In *Lyles, supra,* a criminal case, we held that a showing of the jury's exposure to extraneous information is presumed to be prejudicial, because it involved the right of a criminal defendant to confront the witnesses and evidence against him guaranteed by the Sixth Amendment of the United States Constitution and Article I, Section 23 of the North Carolina Constitution. In a criminal prosecution, violation of a constitutional right is presumed prejudicial, and the presumption must be overcome by a showing that the violation was harmless beyond a reasonable doubt. *Id.* However, no such presumption of prejudice arises in the present case because no violation of any constitutional right is involved. Therefore, defendant must demonstrate that he suffered actual prejudice.

In *Wright v. Holt*, 18 N.C. App. 661, 197 S.E.2d 811, *cert. denied*, 283 N.C. 759, 198 S.E.2d 729 (1973), we upheld the trial court's refusal to set aside the verdict because one of the jurors disclosed after the verdict that she had overheard the defendant make a statement in the restroom that the windshield of plaintiff's car was not broken. In that case, as in the present case, the record demonstrated that the court made a careful investigation, and after a full inquiry into all of the circumstances surrounding the making of the statement and its relevance upon the issue of negligence, which was decided adversely to plaintiff, concluded that it had no prejudicial effect upon the verdict. *Id.* at 662-3, 197 S.E.2d at 812.

After careful review of the examinations which the trial judge conducted of each juror in the present case, we discern no manifest abuse of discretion in the trial court's conclusion that the one juror's conduct did not result in actual prejudice to defendant. All jurors indicated that their deliberations and verdict were based solely and entirely on the evidence, the arguments of counsel, and the charge of

the court, and were not affected by any extraneous information provided by the one juror, identified as Juror No. 12.

Juror No. 4 stated that Juror No. 12 told the other jurors in the jury room on Monday morning, 22 February 1993, during the middle of defendant's presentation of evidence, that over the weekend she had gone to a karate school in Fayetteville and had discussed the "crescent kick," which resulted in plaintiff's injury, with an instructor. According to Juror No. 4, Juror No. 12 stated that the instructor told her that as a trained professional defendant "should have been able to stop on a dime" and "should have full control to be able to stop at any time." Juror No. 4 also testified that the remarks that defendant should have been able to stop on a dime came up during deliberation "only because it was brought out in testimony. It was not referred to—it was never brought up in deliberation." Juror No. 4 was referring to the following testimony elicited from defendant on cross-examination:

Q. Mr. Van Damme your experience in martial arts has taught you to have a great deal of control over your body, hasn't it?

A. Yes, sir.

Q. You can basically start and stop on a dime, can't you?

A. Yes, sir.

Juror No. 4 could not recall anything specific regarding discussions that Juror No. 12 allegedly had with her husband concerning the case.

Juror No. 12 denied stating that she had spoken with a karate instructor or that the instructor made any of the foregoing comments. She did testify that she said that "as a professional, I thought he should be able to pull a kick, you know, because they're trained . . . . But that was my opinion." Juror No. 12 stated that she went to look at a karate school with her husband who "wanted to get back into it." She did not go to the karate school to gather information to use at trial and did not see anything that she had not seen on previous occasions when she had gone to karate schools. She acknowledged that she had watched the class but "never spoke to an instructor" and "never asked him to show me a specific move." She did ask her husband to translate what the instructor was saying because "he spoke in oriental" and "had a very thick accent." Juror No. 12 said that she told the other jurors that:

I had been to the place, that I watched the way they showed the techniques, and then I stated my opinion. I said I watched the instructor, how he did, you know, how he showed them how to—to do their moves, and then I made my statement and I said, um—I said, "Oh, well, it seems like he [defendant] should have known how to pull his punch—how to pull it—how to pull the kick."

Juror No. 12 said that her statement that defendant should have been able to stop on a dime only came up in reference to defendant's own testimony.

Juror No. 12 also testified that on one occasion, her husband was watching the television news when she came home and she asked him to turn it down because she could not watch it. She only observed footage of defendant in court giving a demonstration of the kick which she had previously witnessed. Juror No. 12 also stated that she asked her husband to "execute a crescent kick" which he did but did not tell him why. She testified that she and her husband "never discussed the trial," but that her husband told her that he had heard on the news that defendant's attorneys would seek a mistrial and that she would be "humiliated." According to Juror No. 12, defendant's testimony, a movie presented in the courtroom and "the law of North Carolina" were the only things which had any bearing on her decision.

Additionally, Juror No. 12 offered the affidavits of her husband and the karate instructor. In his affidavit, the husband stated that his wife was never aware of any news reports in the case, that they never discussed the case and that he never expressed an opinion about the case. He stated that it was his idea to stop by a Tae Kwon Do center to determine if he wanted to resume the study of karate. There was a single instructor who spoke poor English and they both left after only a few minutes without speaking to him. He and his juror wife did not discuss what they had seen at the Tae Kwon Do center in relation to the case. The karate instructor testified that he did not speak or understand English and did not remember anyone coming to him and discussing defendant's karate ability.

Other jurors gave various accounts recalling discussions concerning Juror No. 12 visiting a karate school and seeing some news coverage. Several of the jurors did not recall hearing of any of these things and several of those who did indicated that they did not pay attention to Juror No. 12's comments or could not remember details of the conversation she allegedly had with a karate instructor. One juror specifically stated that she understood Juror No. 12's discussion

concerning defendant being able to "stop on a dime" to reflect only Juror No. 12's opinion based on the evidence. Several of the jurors stated specifically that their decision in the case was based solely on the evidence presented at trial.

The examination of the jurors supports the trial court's conclusion that Juror No. 12's actions in going to the karate school, observing the news with the sound turned down, and seeing her husband do a "crescent kick" caused no actual prejudice to defendant. *See State v. Welch*, 65 N.C. App. 390, 308 S.E.2d 910 (1983). (No prejudice when juror read newspaper article about another crime defendant committed where court found juror was in no way influenced by it and verdict resulted from deliberation on the evidence and other matters coming solely from the courtroom.) *State v. Hawkins*, 59 N.C. App. 190, 296 S.E.2d 324 (1982), *disc. review denied*, 307 N.C. 471, 299 S.E.2d 225 (1983). (Defendant's motion for appropriate relief properly denied when based upon affidavits of four jurors stating that during deliberation they used information related to them by juror concerning degree of lighting he observed on a visit to the scene of the crime, as there was considerable testimony as to the visibility during commission of the offenses, the findings of the court were amply supported by the evidence and affidavits did not contain additional or different matters not in evidence at trial.)

Finally, we observe that the trial court, upon notification of the possibility of the jury's exposure to extraneous information, instructed the jury to consider only matters introduced at trial. It is well established that "when the court withdraws incompetent evidence and instructs the jury not to consider it, any prejudice is ordinarily cured." *State v. Smith*, 301 N.C. 695, 697, 272 S.E.2d 852, 855 (1981). This assignment of error is overruled.

[3] Defendant next argues that the trial court erred by denying his motion for new trial on the ground that reputation evidence was improperly admitted. We disagree.

Defendant contends that several witnesses impermissibly testified that he had an overall reputation of engaging in unnecessary and excessive contact with co-workers and injuring them. Specifically he refers to the previously summarized testimony of Elizabeth Featherston, Charles Allen and Martha Lee. Plaintiff asserts, and we agree, that the disputed testimony was not offered to demonstrate a propensity to injure fellow actors, which would violate G.S. § 8C-1, Rule 404, but rather was offered as substantive evidence to demon-

strate the existence of willfulness, wantonness and recklessness, and to negate defendant's contention that plaintiff's injury was the result of an accident or mistake.

G.S. § 8C-1, Rule 404(a) provides generally that evidence of a person's character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion. However, Rule 404(b) allows evidence of other acts as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident. Rule 404 is a general rule of inclusion of evidence, subject to an exception when the only probative value of the evidence is to show a person's propensity or disposition to certain conduct. *State v. West*, 103 N.C. App. 1, 404 S.E.2d 191 (1991). G.S. § 8C-1, Rule 405 provides that in those cases where character evidence is admissible, proof may be made by reputation or opinion testimony and in cases where character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct.

The test for determining whether evidence of crimes, wrongs or acts other than those specifically at issue in the trial is admissible is whether the incidents are sufficiently similar and not too remote in time so as to be more probative than prejudicial under the balancing test of G.S. § 8C-1, Rule 403. *State v. Schultz*, 88 N.C. App. 197, 362 S.E.2d 853 (1987), *affirmed*, 322 N.C. 467, 368 S.E.2d 386 (1988). *See also State v. Syriani*, 333 N.C. 350, 428 S.E.2d 118, *cert. denied*, 126 L.Ed.2d 341 (1993), *reh'g denied*, 126 L.Ed.2d 707 (1994). (Testimony about defendant's frequent arguments with, violent acts toward, separations from, reconciliations with, and threats to, his wife admissible under subsection Rule 404(b) to prove issues defendant disputed in a trial for her murder, namely, lack of accident, intent, malice, premeditation and deliberation.) *State v. Wilson*, 106 N.C. App. 342, 416 S.E.2d 603 (1992). (Evidence that defendant had been convicted of armed robbery thirteen and one-half years prior to trial admissible where evidence was sufficiently similar to crimes charged to be admitted for purpose of showing motive.) *West, supra*. (Past incidents of mistreatment admissible to show intent in child abuse case.)

We hold that the testimony of the witnesses to which defendant objects was admissible under G.S. § 8C-1, Rule 404(b). The evidence regarding defendant's prior acts in engaging in excessive conduct with other co-employees and his reputation created thereby was probative of defendant's motive, intent, and the absence of mistake. The

court did not abuse its discretion in allowing the evidence. Defendant did not request a limiting instruction. The evidence of defendant's misconduct lay at the heart of plaintiff's complaint and was not introduced to prove defendant's character, rather it was introduced and admitted as substantive evidence in support of his claims of willful and wanton negligence. *See MacClements v. LaFone,* 104 N.C. App. 179, 408 S.E.2d 878 (1991), *disc. review denied,* 330 N.C. 613, 412 S.E.2d 87 (1992). (In malpractice action brought against therapist who had sexual relationship with plaintiff client, testimony of three prior relationships between defendant and his patients admissible under Rule 404(b) to show defendant's intent to take advantage of female patients.) *Medina v. Town and Country Ford,* 85 N.C. App. 650, 355 S.E.2d 831, *affirmed,* 321 N.C. 591, 364 S.E.2d 140 (1988). (In action against car dealership alleging breach of contract, malicious prosecution, and unfair and deceptive practices, similar occurrence evidence was probative of defendant's motive, intent, absence of mistake and possible bad faith in its dealings with plaintiff.)

**[4]** By his final assignment of error defendant argues that the trial court erred by entering judgment out of session, out of term and out of county. Absent consent, an order of the superior court must be entered during the term, during the session, and in the county and in the judicial district where the hearing was held, and an order entered inconsistent with that rule is null, void and of no legal effect. *State v. Boone,* 310 N.C. 284, 311 S.E.2d 552 (1984).

The session of court at which the trial was conducted ended on 26 February 1993. The clerk entered the verdict on the minutes of the court, which normally would constitute the entry of judgment. N.C. Gen. Stat. § 1A-1, Rule 58. However, the trial court directed plaintiff's counsel to prepare the judgment, precluding application of the automatic entry provision of the rule. *Reed v. Abrahamson,* 331 N.C. 249, 415. S.E.2d 549 (1992). The written judgment was signed on 2 April 1993, but for some reason not apparent from the record, was not marked "Filed" by the clerk until 21 July 1993. Nevertheless, the proceedings to which the judgment relates were held and concluded prior to the expiration of the session and in the district. Our Supreme Court recently held that:

> We believe the correct rule to be, as stated by a contemporary writer of the subject, "Rule 6(c) permits a judge to sign an order out of term [which we interpret to mean both out of the session and out of the trial judge's assigned term] and out of district with-

JORDAN v. FOUST OIL COMPANY

[116 N.C. App. 155 (1994)]

out the consent of the parties so long as the hearing to which the order relates was held in term and in district."

*Capital Outdoor Advertising Inc. v. City of Raleigh*, 337 N.C. 150, 159, 446 S.E.2d 289, 294-95 (1994), quoting W. Brian Howell, *Howell's Shuford North Carolina Civil Practice and Procedure* § 6-7, at 68 (4th ed. 1992). G.S. § 1A-1, Rule 6(c) provides that the expiration of the court's session has no effect on the power of the court "to do any act or take any proceeding" which rule "clearly allows a superior court judge to sign a written order out of session *without* the consent of the parties so long as the hearing to which the order relates was held in term." *Id.* at 158-59, 446 S.E.2d at 294; *See Daniels v. Montgomery Mut. Ins. Co.*, 320 N.C. 669, 360 S.E.2d 772 (1987); *Feibus & Co. v. Const. Co.*, 301 N.C. 294, 271 S.E.2d 385 (1980), *reh'g denied*, 301 N.C. 727, 274 S.E.2d 228 (1981). (Rule 6(c) clearly allows written order to be signed out of term, especially when such act merely documents decision made and announced before expiration of the term.) This assignment of error is overruled.

No error.

Judges COZORT and ORR concur.