HEATHER FALLIS AND RICHARD FALLIS, AND HEATHER FALLIS AS GUARDIAN AD LITEM FOR HOLLY LEA FALLIS, PLAINTIFFS-APPELLANTS V. WATAUGA MEDICAL CENTER, INC., BY NAME CHANGE FROM WATAUGA HOSPITAL, INC., R. BRUCE JACKSON, II, M.D., AND R. BRUCE JACKSON, II, M.D., P.A., AND LYNN GEORGE, M.D., DEFENDANTS-APPELLEES

No. COA97-621

(Filed 19 January 1999)

**1. Damages— collateral source rule—Medicaid—evidentiary references**

The trial court did not abuse its discretion by denying plaintiffs' motions for a mistrial in a medical malpractice action arising from a birth where plaintiffs alleged that references were

made to plaintiffs' application for and receipt of Medicaid and other forms of public assistance for the victim in violation of the collateral source rule. The record supports the assertion that the first mention of Medicaid was inadvertent and there was no abuse of discretion in view of the context within which the second question was asked, the trial court's prompt sustaining of plaintiff's objection and willingness to give a limiting instruction to the jury, and plaintiffs' apparent decision to decline the court's offer of such instruction.

**2. Damages— collateral source rule—Medicaid—argument of counsel**

The trial court did not abuse its discretion in a medical malpractice action by overruling the objection of plaintiffs to an argument of a defense counsel characterized as a reference to public assistance benefits. A challenge by defense counsel to plaintiffs' failure to present particularized evidence in the form of medical bills is far different from asserting to the jury that damages would never be suffered by virtue of payments from collateral sources.

**3. Trial— motion for new trial—not timely**

The trial court did not err in a medical malpractice action by denying plaintiffs' motion for a new trial where judgment was entered on 8 July 1996, plaintiffs' motion for a new trial was dated 19 July 1996, had attached a certificate of service reflecting mailing to defendants on the same date, and was filed with the clerk on 22 July 1996. Under N.C.G.S. § 1A-1, Rule 59(b), the motion must be served within ten days of the entry of judgment and failure to do so prevents the court from having jurisdiction to entertain the motion.

**4. Damages— collateral source rule—new trial denied**

The trial court did not abuse its discretion in a medical malpractice action by denying plaintiffs' motion for a new trial due to references to collateral source benefits where plaintiff complained of only four collateral source references in a trial of several weeks, which comprised fourteen volumes and nearly three thousand pages of transcripted proceedings; only one reference was direct and made no mention of receipt of collateral benefits or actual payment by collateral sources; and the remaining three were tangential, with plaintiffs' objections to two of those being promptly sustained by the trial court.

FALLIS v. WATAUGA MEDICAL CTR., INC.

[132 N.C. App. 43 (1999)]

**5. Evidence— expert witnesses—data on which opinion based**

The trial court did not err in a medical malpractice action by failing to compel a defense expert witness to produce data and facts upon which he based his testimony where the expert relied in deposition upon an article he had earlier published dealing with the causes of brain injuries in newborns, indicated that he was then engaged in additional unpublished research on the subject, and declined as being unduly burdensome to produce copies of the raw data upon which his current research was based. Rule 705 is directed at disclosure in the context of testimony at trial and is not the equivalent of a request for production of documents. Plaintiffs here failed to utilize pretrial discovery measures or subpoenas to secure the documentation and were afforded ample opportunity to cross-examine the expert regarding the basis of his opinions.

**6. Appeal and Error— appealability—pretrial motion—withdrawn—waiver**

In an appeal decided upon another issue, the procedural context of plaintiffs' Rule 705 motion at trial was suggestive of waiver of the right to raise the denial of the motion on appeal where plaintiffs had filed a pretrial motion to strike an expert's testimony based upon his refusal to produce materials related to previous cases he had reviewed, defendants had moved for a protective order, counsel subsequently appeared in court and announced a compromise involving withdrawal of both motions, the identical issues were again raised by the parties by motions in limine at the outset of the trial as a result of the earlier consent order having broken down, the trial court suggested that the parties attempt to resolve the disputes, and counsel for plaintiffs announced to the trial court the following morning that his motion would be withdrawn. Arguably, plaintiffs are precluded on appeal from pursuing contentions twice withdrawn in the trial court; this circumstance reinforces the previous holding that the court did not err in denying plaintiffs' motion pursuant to N.C.G.S. § 8C-1, Rule 705.

**7. Evidence— doctrine of corporate liability—collective evidence rulings**

The trial court did not err in a medical malpractice action which included a hospital as a defendant where plaintiffs alleged that the court made various erroneous rulings with the effect of

creating a trial setting in which plaintiffs would not be able to prove their case under the doctrine of corporate liability.

Appeal by plaintiffs from judgment entered 8 July 1996 by Judge C. Walter Allen and orders entered by Judge Loto G. Caviness and Judge James L. Baker, Jr., in Watauga County Superior Court. Heard in the Court of Appeals 28 January 1998.

*Egerton & Brenner, by Lawrence H. Brenner, L. Pierce Egerton and Rebeccca A. Leigh, pro hac vice, for plaintiffs-appellants.*

*Mitchell, Blackwell & Mitchell, by W. Harold Mitchell and Keith W. Rigsbee, for defendants-appellees R. Bruce Jackson, II, M.D. and R. Bruce Jackson, II, M.D., P.A.*

*Kurdys & Lovejoy, by Mark C. Kurdys, for defendant-appellant Watauga Medical Center, Inc.*

*State of Florida Agency for Health Care Administration, by Paul A. Vazquez, amicus curiae.*

JOHN, Judge.

Plaintiffs appeal the judgment and several orders in this medical malpractice action. Plaintiffs contend the trial court erred by: (1) denying their motions for mistrial and for new trial based upon defendants' alleged references to plaintiffs' receipt of collateral source benefits; (2) failing to compel a defense expert to produce data and facts upon which he based his testimony; and (3) entering certain evidentiary orders. For the reasons set forth herein, we conclude the trial court committed no prejudicial error.

Pertinent factual and procedural information includes the following: On 5 March 1992 at about 2:15 p.m., plaintiff Heather Fallis (Heather) sought evaluation at defendant Watauga Medical Center, Inc. (Watauga) for potential early onset of labor regarding her second child. Plaintiff was admitted to Watauga under the care and treatment of defendant Dr. R. Bruce Jackson, II (Dr. Jackson).

At 4:50 p.m. on that same date, Dr. Jackson prescribed intravenous administration of oxytocin to augment the labor process. At the time the drug was administered, an internal electric fetal monitor was inserted to record the unborn baby's heart rate and the strength and duration of Heather's contractions. At 5:15 p.m., alteration of the baby's heartbeat was observed by Janet Belden, R.N. (Nurse Belden),

FALLIS v. WATAUGA MEDICAL CTR., INC.

[132 N.C. App. 43 (1999)]

who was attending Heather and who communicated the information to Dr. Jackson. At 6:20 p.m., the oxytocin dosage was increased. Shortly thereafter, Nurse Belden telephoned Dr. Jackson at home to inform him of additional fetal heart rate abnormalities revealed by the monitor. In the time period between 6:40 p.m. and 8:05 p.m., Nurse Belden faxed the baby's heart monitor strips to Dr. Jackson at his home and the latter adjusted Heather's oxytocin dosage. At 8:10 p.m., Nurse Belden notified Dr. Jackson that the baby's heart rate had dropped significantly for a full minute and advised him to come to the hospital. Dr. Jackson arrived at 8:25 p.m. The operating room crew was paged to prepare for an immediate cesarean section and responded in approximately ten minutes. Plaintiff Holly Fallis (Holly) was born shortly thereafter.

Holly required major resuscitative efforts following birth including intubation and external cardiac massage. She was subsequently transferred to Baptist Hospital Neonatal Intensive Care Unit in Winston-Salem, and was diagnosed as having cerebral palsy and profound neurological damage.

Heather, in her own capacity and as guardian *ad litem* for Holly, and her husband Richard (Richard) (collectively "plaintiffs") filed the instant complaint claiming the negligence of defendants proximately caused Holly's condition. In particular, plaintiffs alleged Dr. Jackson deviated from the applicable standard of care in multiple respects, resulting in oxygen deprivation and consequently Holly's subsequent afflictions. Plaintiffs also alleged Watauga was negligent in failing to curtail, limit or otherwise regulate the medical practice of Dr. Jackson as it related to the delivery of infants on its premises and that such failure likewise was a proximate cause of Holly's injuries.

After extensive discovery, the case came to trial 20 May 1996. Plaintiffs offered evidence tending to show Holly suffered prenatal asphyxia in consequence of the negligence of defendants. Defendants' evidence indicated Holly's condition resulted from septic shock prior to delivery occasioned by *Haemophilus influenza* non-type B, a bacterial infection contracted by the fetus *in uteri*. Defendants' evidence also suggested failure on the part of Holly's parents to provide financial support, violence or threatened violence between Holly's parents, and their leaving Holly in the care of others for periods of time while one or the other engaged in some personal pursuit. The jury returned a verdict in favor of defendants 11 June 1996, determining neither defendants' negligence was a proximate

FALLIS v. WATAUGA MEDICAL CTR., INC.

[132 N.C. App. 43 (1999)]

cause of Holly's injuries. Judgment was entered 8 July 1996, and plaintiffs moved for new trial 22 July 1996. The motion was denied in an order entered 18 September 1996. Plaintiffs timely appealed.

[1] In the main, plaintiffs insist "repeated references during the trial" were made "to plaintiffs' application for and receipt of Medicaid and other forms of public assistance for Holly." In this regard, plaintiffs assign error to denial of their motions for mistrial, to the overruling of their objections to the closing argument of counsel for Dr. Jackson, and to denial of their new trial motion.

Plaintiffs' motions for mistrial occurred: (1) shortly after Dr. William Hickling (Dr. Hickling), a pediatric neurologist and Holly's treating physician, read on cross-examination from his records a telephone message from Heather which included a reference to the latter's application for Medicaid; and (2) after the trial court had sustained plaintiffs' objection to a question on cross-examination of Heather regarding her establishment of residency in Florida. Both mistrial motions were denied.

A motion for mistrial rests within the sound discretion of the trial court. *Ferebee v. Hardison*, 126 N.C. App. 230, 236, 484 S.E.2d 857, 861, *rev'd on other grounds*, 347 N.C. 346, 492 S.E.2d 354 (1997). Therefore,

> unless the [trial court's] ruling is clearly erroneous so as to amount to a manifest abuse of discretion, it will not be disturbed on appeal.

*Id.* Applying the foregoing test to the case *sub judice*, we decline to disturb the trial court's rulings.

Plaintiffs allege each challenged instance was violative of the collateral source rule, which

> excludes evidence of payments made to the plaintiff by sources other than the defendant when this evidence is offered for the purpose of diminishing the defendant tortfeasor's liability to the injured plaintiff.

*Badgett v. Davis*, 104 N.C. App. 760, 764, 411 S.E.2d 200, 203 (1991), *disc. review denied*, 331 N.C. 284, 417 S.E.2d 248 (1992). The policy underlying the doctrine is that

> [a] tort-feasor should not be permitted to reduce his own liability for damages by the amount of compensation the injured party receives from an independent source.

FALLIS v. WATAUGA MEDICAL CTR., INC.

[132 N.C. App. 43 (1999)]

*Fisher v. Thompson,* 50 N.C. App. 724, 731, 275 S.E.2d 507, 513 (1981).

Plaintiffs rely primarily upon *Cates v. Wilson,* 83 N.C. App. 448, 350 S.E.2d 898 (1986), *aff'd in part,* 321 N.C. 1, 361 S.E.2d 734 (1987). Defendant health care providers therein were allowed to present evidence tending to show that Medicaid had paid and would continue to pay all the plaintiff's medical bills, as well as evidence of other welfare programs available to defray plaintiff's expenses, child support received by plaintiff's mother, free rent and other support provided by plaintiff's grandmother, and evidence of excellent training for persons suffering plaintiff's handicaps offered at a local public school. *Cates,* 321 N.C. at 4-5, 361 S.E.2d at 737. In addition, the defendants' closing argument contained assertions that in consequence of the evidence of payment and available treatment, plaintiff had suffered no damages. *Id.* at 10, 361 S.E.2d at 740.

Our Supreme Court agreed the foregoing violated the collateral source rule and mandated a new trial, rejecting the argument that the jury's consideration of the liability issues was unaffected "[i]n light of this kind of argument and the nature of the collateral source evidence which was so freely admitted." *Id.* at 11, 361 S.E.2d at 740; *see also Badgett,* 104 N.C. App. at 762, 411 S.E.2d at 202 (new trial granted where testimony revealed portions of medical bills either had been paid by Medicare or "written off" upon receipt of Medicare payments by the furnishing health care provider).

Defendants respond that the extensive evidence held in *Cates* to contravene the collateral source rule was of a different character than the instances complained of in the instant case, and that the trial court did not abuse its discretion in denying the motions for mistrial. We agree.

The solitary direct reference to the collateral source of Medicaid transpired during cross-examination of Dr. Hickling by Dr. Jackson's counsel. Counsel was conducting a thorough review of Dr. Hickling's extensive records during which the latter read from an office note of his staff as follows:

> Heather called, stated Holly's blood levels have not been checked, they are in Florida temporarily, has applied for Medicaid, has a question about meds, please call.

Counsel thereafter directed no follow-up questions to the matter of Medicaid, nor does the record reflect any attempt to draw attention

thereto. Significantly, unlike the circumstances in *Cates*, this single Medicaid application reference within a cross-examination covering over one hundred pages of transcript contained no indication the application had been approved, that plaintiffs had received any payments, or that any of Holly's medical expenses had been defrayed by the program.

Moreover, the record supports defendants' assertion that Dr. Hickling's mention of Medicaid in response to cross-examination was inadvertent. Examination of the transcript of Dr. Hickling's testimony reflects that the telephone message was part of his extensive office records which were provided to defense counsel at the time of Dr. Hickling's testimony, notwithstanding assurances by the doctor at his deposition some two years earlier that he would copy his rather sizable file to plaintiff's counsel who would then forward same to counsel for defendants. It appears defendants' counsel were afforded only a brief opportunity to review the voluminous records during a recess following Dr. Hickling's direct examination. At the hearing on plaintiffs' motion for mistrial, the ignorance of Dr. Jackson's counsel concerning the Medicaid notation prior to Dr. Hickling's testimony was not disputed. In any event, the solitary, apparently inadvertent reference herein pales beside the multiple, varied and deliberate instances in *Cates*.

Finally, the record reflects plaintiff tendered no objection immediately upon the mention of Medicaid, *see* N.C.R. App. P. 10(b)(1) ("in order to preserve a question for appellate review, a party must have presented to the trial court a timely . . . objection . . . stating the specific grounds for the ruling the party desired the court to make"), although counsel asked to approach the bench shortly thereafter and, following an unrecorded conference, the trial court stated, "We'll take that up just before we recess today." Later, outside the presence of the jury, upon plaintiffs' request that the trial court "declare a mistrial, [or] have a special instruction" in view of the Medicaid reference, the court declined to order a mistrial. However, the court offered plaintiffs the option of a special instruction formulated by the court or one drafted by plaintiffs. Plaintiffs initially responded that an instruction would be produced the following morning, but at that time indicated "two typed proposals" would be presented to the court the morning thereafter. However, nothing in the record reveals plaintiffs subsequently proffered a proposed limiting instruction to the trial court.

**FALLIS v. WATAUGA MEDICAL CTR., INC.**

[132 N.C. App. 43 (1999)]

Based on the foregoing, we cannot say the trial court's denial of plaintiffs' initial mistrial motion was "clearly erroneous so as to amount to a manifest abuse of discretion." *See Ferebee*, 126 N.C. App. at 236, 484 S.E.2d at 861.

Plaintiffs' second mistrial motion was occasioned by the following exchange on cross-examination of Heather by Dr. Jackson's counsel.

Q. You indicated that Dr. Hickling told you that he thought it would be good for [Holly] to move to Florida.

A. That's correct.

Q. Because the heat would be good for Holly?

A. Yeah.

Q. Yet you have decided that the heat is bad for Holly?

A. The humidity is extremely hot down there, now that I'm there, although the sea is very good for her, the sea air.

. . . .

Q. After you got down to Florida, you did establish a residence in Florida, did you not?

A Yes, sir, we did.

Q And you had to do that in order to be able to get the health care that was needed by Holly, didn't you?

MR. BRENNER: Objection.

MS. LEIGH: Objection.

THE COURT: Objection sustained.

When further questioning revealed Heather had taken Holly to health care providers in Florida, including a hospital stay, counsel for Dr. Jackson asked to approach the bench to register his concern that the appropriate medical records from Florida had not been furnished by plaintiffs. In the absence of the jury and prior to responding, counsel for plaintiffs moved for a mistrial, asserting "that [the residency] question was asked to plant in this jury's mind Medicaid, which is a collateral source." In reply, counsel for Dr. Jackson explained as follows:

Your Honor, we took her deposition February 29, 1996, and I had asked her if she had established a relationship with any health care providers down there. Her response was no, she had to establish residency; she was doing that at that time. And quite frankly, that's exactly what she said and that didn't have anything to do with Medicaid . . . .

The trial court denied plaintiffs' mistrial motion, noted it had been several days since plaintiffs' counsel had indicated it would present a limiting instruction, and stated it would "offer the same thing" to plaintiffs regarding the instance then at issue. We again note the record reveals no tender by plaintiffs to the trial court of the promised instruction. Indeed, following the conclusion of all the evidence and prior to the closing arguments of counsel, the trial court inquired if either plaintiffs or defendants requested further instructions. None were sought by plaintiffs.

In view of the context within which the question challenged on plaintiffs' mistrial motion was asked, as well as the trial court's prompt sustaining of plaintiffs' objection and willingness to give a limiting instruction to the jury, as well as plaintiffs' apparent decision to decline the court's offer of such instruction, we conclude the trial court did not abuse its discretion in denying plaintiffs' second motion for mistrial.

[2] Plaintiffs next contend the trial court erred in overruling their objections during the following portion of the closing argument of counsel for Dr. Jackson:

We have heard about Holly having been in the hospital. We have heard about Holly having received medical care. But you have not seen a single medical bill. The first case I've ever been in my life where they're suing for damages and have not put in all of the medical bills that have been incurred up until this time. You haven't seen it. I haven't seen it. The Court hasn't seen it.

Why, why, Mr. Brenner, have you brought this lawsuit and—

MR. BRENNER: Your Honor, I object. This is—

THE COURT: Objection sustained to directing remarks to Mr. Brenner.

MR. BRENNER: We went over this issue. I'd ask the jury be instructed to disregard it.

**FALLIS v. WATAUGA MEDICAL CTR., INC.**

[132 N.C. App. 43 (1999)]

THE COURT: Objection is overruled.

MR. MITCHELL: Why have they not put the medical bills into evidence?

MR. BRENNER: Object again, Your Honor.

THE COURT: Overruled.

MR. MITCHELL: . . . It may be that the medical bills were so small that they felt like that they would be so contradictory to [the experts'] figures or it may be that because of their own actions they felt that it just wouldn't be right to come here and ask for recovery of medical expenses.

Plaintiffs characterize the foregoing as a

transparent reference to the plaintiffs' actions in seeking and obtaining public assistance benefits . . . and impermissibly suggested to the jury that the plaintiffs were already fully compensated and were seeking a windfall recovery.

We do not agree.

Initially, we note it is well established that counsel are accorded wide latitude in argument to the jury, and that

[i]t is left to the trial judge's sound discretion to determine whether counsel has abused [that] latitude accorded him in the argument of hotly contested cases. [The appellate courts] will not review the judge's exercise of discretion unless there exists such gross impropriety in the argument as would likely influence the jury's verdict.

*State v. Hockett*, 309 N.C. 794, 799, 309 S.E.2d 249, 252 (1983).

Plaintiffs nonetheless refer us once more to *Cates*. However, defendants' counsel therein pointedly argued "that this child would [not suffer the loss of] a penny with its Medicaid, its Aid to Dependent Children." *Cates*, 321 N.C. at 10, 361 S.E.2d at 740. We believe the challenge by Dr. Jackson's counsel to plaintiffs' failure to present particularized evidence of damages in the form of medical bills is far different from asserting to the jury that claimed damages would never be suffered by virtue of payments from collateral sources.

The context of counsel's argument also mitigates against our determination it constituted "gross impropriety." *Hockett*, 309 N.C. at 799, 309 S.E.2d at 252. Immediately prior to the statements at issue,

FALLIS v. WATAUGA MEDICAL CTR., INC.

[132 N.C. App. 43 (1999)]

counsel for Dr. Jackson had, without objection, addressed certain actions and inactions of Heather and Richard indicating shortcomings as parents. Counsel referred to evidence the couple had separated, that Heather had begun seeing another man and followed him to Florida, that Richard was under court order to pay child support and as of March 1996 was $3000.00 behind in those payments, and that Heather had at one point left Holly and gone to Tennessee with her boyfriend for two weeks. Counsel then questioned the absence of medical bills in evidence and referred to the "actions" of Heather and Richard as a possible explanation for the failure to present documentation of medical expenses.

In short, we hold the trial court did not abuse its discretion in overruling the objection of plaintiffs to the argument of Dr. Jackson's counsel as set out above.

[3] Lastly, citing the three instances above and one additional statement by Dr. Hickling to which the trial court sustained plaintiffs' objection, plaintiffs maintain the trial court erred "in failing to order a new trial due to references and argument regarding plaintiffs' receipt of collateral source benefits." We also reject this argument.

N.C.G.S. § 1A-1, Rule 59(b) (1990) (Rule 59(b)) provides in pertinent part as follows:

(b) Time for motion.—A motion for a new trial shall be served not later than 10 days after entry of the judgment.

Judgment was entered in the case *sub judice* 8 July 1996. *See* N.C.G.S. 1A-1, Rule 58 (Supp. 1997) ("judgment is entered when it is reduced to writing, signed by the judge, and filed with the clerk of court"). Plaintiffs' motion for new trial was dated 19 July 1996, had attached thereto a certificate of service reflecting mailing to counsel for defendants on the same date, and was filed with the clerk of court 22 July 1996.

Under Rule 59(b),

the motion *must* be served within 10 days of the entry of judgment, for a failure to do so prevents the court from having jurisdiction to entertain the motion. Rule 6(b) specifically prohibits enlargement of the time for serving a motion for a new trial either by order of the court or by agreement of the parties.

W. BRIAN HOWELL, HOWELL'S SHUFORD N.C. CIV. PRAC. & PROC. § 59-13, 718 (5th ed. 1998).

**FALLIS v. WATAUGA MEDICAL CTR., INC.**

[132 N.C. App. 43 (1999)]

Accordingly, the trial court lacked jurisdiction to entertain plaintiffs' Rule 59 motion, *see Coats v. Coats*, 79 N.C. App. 481, 482, 339 S.E.2d 676, 676 (1986) ("trial court has no authority to alter or amend a judgment under [Rule 59] pursuant to a motion made more than 10 days after entry of the judgment sought to be altered or amended"), and plaintiffs may not now complain the motion was denied. *See Garrison ex rel. Chavis v. Barnes*, 117 N.C. App. 206, 210, 450 S.E.2d 554, 557 (1994) ("[b]ecause defendant's motion for new trial was filed . . . more than ten days after entry of . . . judgment . . . [the trial court] correctly denied that motion").

Moreover,

[t]he granting or denial of a motion for new trial rests within the sound discretion of the trial judge, and his ruling will not be disturbed on appeal in the absence of a manifest abuse of such discretion or determination that his ruling is clearly erroneous.

*Pinckney v. Van Damme*, 116 N.C. App. 139, 148, 447 S.E.2d 825, 831 (1994).

[4] Assuming *arguendo* plaintiffs' argument asserting the necessity of a new trial was properly before us, therefore, having determined no abuse of discretion in the matters cited as grounds for the motion, we perceive no manifest abuse of the trial court's discretion in its denial of the motion. Plaintiff complains of but four collateral source references in this trial of several weeks, comprising fourteen volumes and nearly three thousand pages of transcribed proceedings. Only one reference was direct and made no mention of receipt of collateral benefits or actual payment by collateral sources, and the remaining three were tangential, plaintiffs' objections to two of those being promptly sustained by the trial court. The trial court's ruling therefore may not fairly be characterized as "clearly erroneous," *see id.*, and thus it did not err in denying plaintiffs' new trial motion.

[5] Plaintiffs' second assignment of error asserts the trial court erred by failing to compel a defense expert witness "to produce data and facts upon which he . . . bas[ed] his testimony." Plaintiffs' argument misses the mark.

Defendants called Richard L. Naeye, M.D. (Dr. Naeye), Chair of the Department of Pathology at Penn State University, as an expert witness. At the time of Dr. Naeye's 17 April 1996 deposition, he relied upon an article he had earlier published dealing with the causes of brain injuries in newborns. He also indicated he was then engaged in

additional unpublished research on the subject, but declined as being unduly burdensome to produce copies of the raw data upon which his current research was based. Upon direct examination at trial, defendants' counsel inquired as to Dr. Naeye's recent research, and the latter responded he had reviewed sixty cases that he relied upon in forming his opinion. Finally, Dr. Naeye expressed his opinion that Holly sustained irreversible brain damage from septic shock approximately eighteen hours prior to her delivery.

Upon commencement of plaintiffs' cross-examination of Dr. Naeye, the following transpired:

Q. Dr. Naeye, before I get into my examination, you made reference to materials upon which you based your decision, research involving 60 cases, research involving sudden infant death syndrome and research involving cases other than your published article. Do you recall that?

A. Yes.

Q. Okay. Could you make those available to me?

A. Sure, what would you like? I don't have them here.

Q. Okay. Do you have available to you the research that you referred to in your direct testimony that occurred after the November 1995 article? ·

. . . .

A. . . . Yeah, we're working on cases right now.

Q. Okay. Well, the 60 cases you referred to, the infant death syndrome and the other cases, could you when you go back make them available for me by Federal Express so I can analyze them?

. . . .

A. Some of [the data] is available. But it's not reasonable. You have no idea what you're asking, because in many cases there are volumes of information that are six or eight inches thick. You're asking my to stop everything else I'm doing in my life and sit down and have thousands of pages of charts, many of which are on microfilm, copied. It's not practical.

Thereafter, outside the presence of the jury, plaintiffs' counsel phrased the above request as a motion, proffered pursuant to N.C.G.S. § 8C-1, Rule 705 (1986) (Rule 705), that Dr. Naeye "go back

**FALLIS v. WATAUGA MEDICAL CTR., INC.**

[132 N.C. App. 43 (1999)]

and make [the data] available for us and we'll deal with it on rebuttal" through plaintiffs' expert witness. The record reflects no prior written request by plaintiffs for production of the data of Dr. Naeye, either pursuant to N.C.G.S. § 1A-1 Rule 26(b)(4) (1990) (Discovery—Trial Preparation: Experts), N.C.G.S. § 1A-1, Rule 34 (1990) (Production of Documents) or N.C.G.S. § 1A-1, Rule 45(c) (1990) (Subpoena—For Production of Documentary Evidence).

The trial court denied plaintiffs' motion, but explained that plaintiffs' counsel was not restricted in examining Dr. Naeye regarding the basis for his opinions, including the ongoing research. Plaintiffs' counsel thereafter cross-examined Dr. Naeye at length, specifically inquiring as to the basis for his opinions, including his research and publications.

Plaintiffs now argue the trial court erred under Rule 705 by failing "to require disclosure of the underlying facts or data of the expert's opinion prior to his testimony and on cross-examination." In the context of the case *sub judice*, we conclude the trial court did not err.

Rule 705 reads in pertinent part as follows:

The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless an adverse party requests otherwise, in which event the expert will be required to disclose such underlying facts or data on direct examination or voir dire before stating the opinion. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

G.S. § 8C-1, Rule 705.

The Commentary to Rule 705 explains that:

[u]pon the request of an adverse party, the judge must require the expert to disclose the underlying facts on direct examination or voir dire before stating the opinion. . . .

The second sentence of Rule 705 gives the opposing side the right to require disclosure of the underlying facts or data on cross-examination. The cross-examiner is under no compulsion to bring out any facts or data except those unfavorable to the opinion. *N.C. Civ. Pro. Rule 26(b)(4) provides for substantial discovery of the facts underlying the opinion prior to trial.*

G.S. § 8C-1, Rule 705, Commentary (emphasis added).

A careful reading of Rule 705 and the Commentary reveal that the Rule is directed at disclosure in the context of testimony at trial. The clear purport of the section is that, "unless an adverse party requests otherwise," G.S. § 8C-1, Rule 705, an expert's testimony at trial may properly be limited merely to a statement of qualifying credentials and rendition of the expert's opinion, whereupon opposing counsel might then elect to cross-examine the expert regarding any "unfavorable" facts or data. See G.S. § 8C-1, Rule 705, Commentary (N.C. Rule 705 differs from equivalent federal rule in that the former leaves it to "opposing counsel [rather than the court] to determine whether to require prior disclosure of the underlying facts"). As defendants correctly assert, therefore, "Evidence Rule 705 is not the equivalent of a request for production of documents," which vehicle the Commentary to the Rule pointedly notes is available "prior to trial." Id.

We therefore conclude the trial court did not err in denying plaintiffs' motion pursuant to Rule 705 to "make [Dr. Naeye's research] available [to plaintiffs] by Federal Express." Plaintiffs failed to utilize pre-trial discovery measures or subpoenas to secure the documentation and were afforded ample opportunity to cross-examine Dr. Naeye regarding the basis of his opinions.

[6] Additionally, defendants maintain plaintiffs waived their right to raise denial of their Rule 705 motion on appeal. While it is unnecessary to so hold in view of our determination the trial court did not err in this regard, the procedural context of plaintiffs' motion at trial is indeed suggestive of waiver. While tendering no written request for production of Dr. Naeye's data, plaintiffs filed a pre-trial motion 23 April 1996 to strike his testimony based upon his refusal to produce as orally requested at deposition all materials related to previous cases he had reviewed or in which he had served as consultant or expert witness and all the raw data supporting his research. Defendants meanwhile had moved 9 April 1996 for a protective order seeking to exclude the testimony of Dr. Bahig Shehata, identified by plaintiffs as an expert to rebut the testimony of Dr. Naeye. On 29 April 1996, counsel appeared in court and announced a compromise involving withdrawal of both motions.

The identical issues were again raised by the parties by motions in limine at the outset of trial as a result of the earlier "consent order [having] broke[n] down." Following day-long arguments covering over sixty pages of transcript, the trial court suggested that the par-

**FALLIS v. WATAUGA MEDICAL CTR., INC.**

[132 N.C. App. 43 (1999)]

ties attempt overnight to resolve the disputes. The following morning, counsel for plaintiffs announced to the trial court:

> [the] resolution is that we withdraw our motion as to Dr. Naeye, he's withdrawing his motion as to rebuttal witnesses . . . . That would resolve all of those issues with regard to Dr. Naeye.

It thus appears plaintiffs had raised on two prior occasions the identical issues forming the basis of the motion at trial pursuant to Rule 705, and that plaintiffs had ultimately elected to withdraw those issues from the trial court's consideration. Arguably, therefore, plaintiffs are precluded from pursuing before us contentions twice withdrawn in the trial court. *See State v. Larrimore,* 340 N.C. 119, 149, 456 S.E.2d 789, 805 (1995) (where "defendant withdraws challenged questions . . . the court's ruling [thereon] has [not] been preserved for review"; "defendant abandoned his position at trial and cannot now resume the battle in [appellate] forum"). Such circumstance simply reinforces our holding that the trial court did not err in denying plaintiffs' motion as proffered pursuant to Rule 705.

[7] Lastly, plaintiffs assert the trial court made various erroneous rulings with the effect of creating "a trial setting in which Plaintiffs would not be able to prove their case against Watauga under the doctrine of corporate liability." Specifically, plaintiffs allege the court erred by: (1) granting defendants' motion for protective order; (2) granting defendants' motions *in limine* regarding evidence of past performance problems of Dr. Jackson; and (3) restricting impeachment of Nurse Belden during cross-examination regarding the professional conduct of Dr. Jackson. In each instance, we disagree.

Initially, we observe that plaintiffs were afforded extensive avenues of opportunity to advance their claim of corporate liability, especially through the testimony of their expert witness on hospital quality assurance, Susan DesHarnais, Ph.D. Plaintiffs' evidence, for example, tended to indicate failure of Watauga to develop adequate policies and procedures regarding labor and delivery, and to train labor and delivery nurses concerning such policies and procedures. In addition, evidence tended to reflect inadequate clinical monitoring and/or skills verification in electronic fetal monitoring and other clinical skills, failure of Watauga to establish appropriate lines of communication with labor and delivery services and contingencies, and lack of appropriate avenues for nurses to express their feelings relating to patient care issues.

Turning now to plaintiffs' complaints addressed to the issuance of protective orders, we note plaintiffs through discovery had sought (a) from Watauga the complete labor and delivery records for Dr. Jackson from the time he joined the medical staff at Watauga through 5 March 1992; (b) answers to interrogatories to Dr. Jackson regarding whether his performance at Watauga had ever been evaluated by an expert from outside the hospital and whether he had ever been reported to the National Practitioner Data Base (NPDB); and (c) answers to interrogatories and production of documents from Watauga concerning similar information. The motions for protective orders of both Dr. Jackson and Watauga as to the foregoing information were allowed.

N.C.G.S. § 1A-1, Rule 26(c) (1990) provides for the issuance of protective orders for "good cause shown" in order to protect against "unreasonable annoyance, embarrassment, oppression, or undue burden or expense." Further, discovery orders are generally within the discretion of the trial court and will not be upset on appeal absent a showing of abuse of discretion. *Powers v. Parisher*, 104 N.C. App. 400, 409, 409 S.E.2d 725, 730 (1991), *appeal dismissed* and *disc. review denied*, 331 N.C. 286, 417 S.E.2d 254 (1992). We conclude no abuse of discretion is reflected in the instant record.

Dr. Jackson represented that his medical records covered approximately five hundred and forty (540) patients, averaged one hundred (100) to one hundred thirty (130) pages in length each, and were replete with confidential information specifically protected by N.C.G.S. § 131E-76 (1997) so as to necessitate exhaustive scrutiny and extensive redaction. Moreover, plaintiffs' request was filed more than thirty months following filing of suit and but three months prior to the commencement of trial on 20 May 1996. Based on these circumstances alone, we believe the trial court might properly have determined the request to constitute an undue burden or expense or to be unreasonably tardy, and thus it did not err in allowing a protective order concerning Dr. Jackson's records.

With regard to the interrogatories concerning the exchange of information between Watauga and the NPDB, defendants maintain such disclosure is specifically prohibited by the federal statutory scheme creating the data base. *See* 42 U.S.C. § 11137(b)(1) (1986); Pub. L. No. 99-660, Title IV, § 427, 100 Stat. 3791 (1986) and 45 C.F.R. § 60.13. Plaintiffs do not take issue with this analysis. Accordingly, the trial court did not err in protecting NPDB information from disclosure.

Finally, in interrogatories addressed to both Dr. Jackson and Watauga, plaintiffs requested as follows:

> In his deposition, John R. Marchese, M.D. states that if there were "some question as to performance of a physician [at Watauga Medical Center] . . . the Executive Committee would evaluate the situation, usually obtain expert opinion outside the hospital . . . ." With regard to this statement, please state whether any expert opinion with respect to [Dr. Jackson's] performance at Watauga Medical Center was obtained . . . ?

Defendants argue medical review committee proceedings are specifically protected from discovery under N.C.G.S. § 131E-95(b) (1997) (no person "in attendance at a meeting of the committee shall be required to testify in any civil action as to any evidence or other matters produced or presented during the proceedings of the committee") and N.C.G.S. § 131E-97 (1997). *See also Shelton v. Morehead Memorial Hospital*, 318 N.C. 76, 82-84, 347 S.E.2d 824, 828-29 (1986) (sections protect proceedings of medical review committee, records and materials produced therein, as well as materials considered). Plaintiffs respond by pointing to the portion of the statute providing that

> information, documents, or records otherwise available are not immune from discovery or use in a civil action merely because they were presented during proceedings of the committee.

G.S. § 131E-95(b).

In our view, plaintiffs' interrogatory, in seeking information generated by Watauga's medical review committee, on its face requests material protected by the statute which was not "otherwise available," *id.*, that is, the decision whether or not to obtain outside evaluation of Dr. Jackson's performance—a matter indisputably "produced," G.S. § 131-95(b), during quality assurance or credentialing activities of Watauga's medical review committee. In this context, we find particularly pertinent the purpose of G.S. § 131E-95 as expressed by our Supreme Court, "*i.e.*, the promotion of candor and frank exchange in peer review proceedings." *Shelton*, 318 N.C. at 82, 347 S.E.2d at 828.

Finally, plaintiffs question the trial court's grant of defendants' motions *in limine* and restriction of cross-examination of Nurse Belden regarding evidence of Dr. Jackson's professional perform-

ance, notably evidence of deliveries by Dr. Jackson in March 1989 and 30 March 1992.

The trial court's decision on a motion *in limine* will not be reversed on appeal absent an abuse of discretion, *see Carter v. Food Lion, Inc.*, 127 N.C. App. 271, 276, 488 S.E.2d 617, 621, *disc. review denied*, 347 N.C. 396, 494 S.E.2d 408 (1997), *i.e.*, the ruling must be "so unreasonable under the facts of the case as to constitute reversible error." *Id.* Moreover, the trial court has broad discretion in controlling the scope of cross-examination, and such a ruling may likewise not be disturbed absent abuse of discretion and a showing the ruling was so arbitrary it could not have been the product of a reasoned decision. *Jones v. Rochelle*, 125 N.C. App. 82, 85-86, 479 S.E.2d 231, 233, *disc. review denied*, 346 N.C. 178, 486 S.E.2d 205 (1997).

Suffice it to state that after careful review of the record in the instant case, we conclude the trial court did not abuse its discretion in either matter at issue. We elaborate only to note, as an example, that the 30 March 1992 delivery took place subsequent to the delivery of Holly and therefore was not relevant to Watauga's alleged negligence on 5 March 1992. *Cf. Strubhart v. Perry Mem. Hosp. Trust Auth.*, 903 P.2d 263 (Okla. 1995) ("testimony about a doctor's prior conduct is admissible if the hospital . . . knows or should know with the exercise of ordinary care of the prior conduct").

Having thus carefully considered each of plaintiffs' contentions on appeal, we conclude the trial court committed no prejudicial error.

No error.

Judges GREENE and MARTIN, Mark D., concur.

Judge MARTIN, Mark D. concurred prior to 4 January 1999.